FSB v. Keilmans2 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





ON MOTION FOR REHEARING


 




NO. 3-91-418-CV





FIRST STATE BANK,



 
 APPELLANT


vs.





TOM KEILMAN AND MYRNA KEILMAN,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT



NO. 471,759, HONORABLE JERRY DELLANA, JUDGE PRESIDING



 




 The opinion and judgment issued herein by this Court on December 23, 1992, are
withdrawn, and this opinion is filed in lieu of the earlier one.

 First State Bank ("FSB"), appellant, filed suit against Tom and Myrna Keilman,
appellees, to recover the balance owing on a promissory note following the non-judicial
foreclosure of property securing the note. The Keilmans counterclaimed, alleging material
alteration, wrongful foreclosure, and usury. Based on the jury's findings, the trial court rendered
judgment in favor of the Keilmans on their counterclaims and on FSB's deficiency claim. FSB
perfected this appeal, challenging the sufficiency of the evidence to support the jury's findings and
the trial court's judgment. As to all but one of the Keilmans' counterclaims, we will reverse the
judgment of the trial court and render judgment that the Keilmans take nothing. As to one of the
Keilmans' usury counterclaims, we will reverse the trial court's judgment and remand the cause
for further proceedings. As to FSB's deficiency claim, we will reverse the trial court's take-nothing judgment and remand the cause for further proceedings.



BACKGROUND


 On November 1, 1985, the Keilmans executed a promissory note payable to
Frontier National Bank ("Frontier") in the principal amount of $157,000. The note obligated the
Keilmans to pay interest at a rate equal to the lesser of the maximum lawful rate or Frontier's
prime rate plus two percent per annum. The note was secured by a deed-of-trust lien on 563 acres
of land located in Terrell County, Texas (the "property"), which had been purchased by the
Keilmans in 1983. As additional security, the Keilmans pledged a $150,000 note receivable dated
October 1, 1985. The Keilmans renewed and extended this loan several times. In the final
renewal note, executed on August 11, 1986, the Keilmans promised to pay $152,000 plus interest.

 In October 1988 the FDIC closed Frontier, and FSB purchased the Keilmans'
renewal note from the receivership estate.

 By March 1989 the Keilmans were in default. On April 25, 1989, FSB's attorney,
Janice McKennon, formally notified the Keilmans by letter that they were in default and demanded
payment of all past due sums. On May 15, 1989, McKennon informed the Keilmans by letter that
FSB had accelerated their indebtedness and scheduled a trustee's sale of the property securing the
loan for June 6, 1989, at the Terrell County courthouse.

 On behalf of FSB, McKennon hired Terrell County Attorney Marsha Monroe to
conduct the foreclosure sale and to bid on the property on behalf of FSB. FSB appointed Monroe
as the substitute trustee under the deed of trust. Monroe filed the appointment of substitute trustee
and the notice of sale with the Terrell County Clerk and posted the notice of sale on the
courthouse bulletin board. Before the proposed foreclosure date, FSB obtained an appraisal that
placed the value of the property at $16,462.20. Based on this appraisal, FSB calculated a bid
price, and McKennon conveyed the proposed bid to Monroe.

 A few days before the scheduled sale, Mr. Keilman spoke with Roy Touchstone,
a loan officer at FSB, who said the foreclosure sale would proceed as planned. Touchstone also
told Keilman of the appraisal received by FSB. Keilman strongly disagreed with the appraised
value and began efforts to borrow money in order to bid against FSB at the foreclosure sale.

 On June 6, 1989, Mr. Keilman and a companion, Carl Bierman, drove to Terrell
County to attend the foreclosure sale, which was to occur on the courthouse steps between 10:00
a.m. and 1:00 p.m. Shortly before 10:30 a.m., Keilman decided to go to the local newspaper
office to see if the sale had been advertised in the newspaper. Before leaving the courthouse,
Keilman authorized Bierman to bid up to $16,000 for the property. Shortly after Keilman left,
Monroe appeared on the courthouse steps to begin the sale. Bierman asked Monroe to wait until
Keilman returned; however, Monroe refused and began the sale in Keilman's absence. 
Apparently having misunderstood Keilman's instructions, Bierman believed he was authorized to
bid only up to $13,000. As a result, he stopped bidding when the price reached $13,000. Monroe
sold the property to FSB for $13,200.

 FSB credited the entire $13,200 toward the Keilmans' indebtedness on the renewal
note. Touchstone then contacted the Keilmans by letter requesting a meeting in order to discuss
a payment plan for the deficiency remaining on the note. After receiving no response, FSB filed
suit to collect on the deficiency. The Keilmans counterclaimed, alleging that FSB materially
altered the promissory note, wrongfully foreclosed on the property, and committed usury. 

 The jury found that FSB altered the note without the Keilmans' consent,
wrongfully foreclosed on the property, committed usury, and engaged in a conspiracy with the
substitute trustee to injure the Keilmans. The jury also found that the unpaid principal balance
on the note was $40,000 and the accrued but unpaid interest was $18,000. Based on these
findings, the trial court awarded the Keilmans $293,000 in statutory usury penalties, $18,200 in
actual damages, $97,000 in exemplary damages, and $68,500 in attorney's fees; the trial court
also rendered judgment that the note was void and that FSB take nothing on its deficiency claim.

 On appeal, FSB asserts fifteen points of error. We will group the points of error
and address each in the order of the following categories: (1) Material Alteration; (2) Wrongful
Foreclosure; (3) Usury; (4) Attorney's Fees; and (5) FSB's Deficiency Claim.



MATERIAL ALTERATION


 In its third point of error, FSB complains that the evidence is both legally and
factually insufficient to support the jury's finding that the interest rate stated in the renewal note
was altered without the consent or authorization of the Keilmans. At trial, the Keilmans produced
a copy of the renewal note in which they promised to pay the principal amount of $152,000
"together with interest thereon at the prime rate established by Frontier National Bank as
described in the [November 1, 1985] note, plus Two percent (12.5%) per annum." In the original
renewal note, produced by FSB at trial, the numeral "12.5%" inside the parentheses was deleted
and replaced with the numeral "2%." The jury found that FSB had altered the interest rate in the
renewal note without the Keilmans' consent. Based in part on this finding, the trial court rendered
judgment that the renewal note was void and that the Keilmans were discharged from liability. (1)

 Under Texas law, an "alteration by a holder which is both fraudulent and material
discharges any party whose contract is thereby changed unless that party assents." See Tex. Bus.
& Com. Code Ann. § 3.407(b)(1) (West 1968). The jury found that the Keilmans did not consent
to an alteration of the interest rate. However, there were no findings of materiality or fraudulent
intent, elements which must be established before discharge from the note is proper. Lawler v.
FDIC, 538 S.W.2d 245, 247 (Tex. Civ. App.--Beaumont 1976, writ ref'd n.r.e.). Because of the
absence of jury findings, the missing elements must be deemed found by the trial court in such
a manner as to support the judgment. See Tex. R. Civ. P. 279.

 FSB's third point of error states: "The evidence is both legally and factually
insufficient to support the jury's answer to Question No. 6 [alteration without consent]." Within
the body of its argument under this point, FSB asserts that there is no evidence of materiality or
fraudulent intent. Because FSB's point of error itself specifically complains only of the jury's
finding regarding the existence of an alteration without the Keilmans' consent, and does not
expressly attack the trial court's deemed findings, the Keilmans argue that FSB has not preserved
its complaint for appeal. We disagree.

 Rule 74(d) of the Rules of Appellate Procedure states that "[a] point is sufficient
if it directs the attention of the appellate court to the error about which a complaint is made." 
Tex. R. App. P. 74(d). As a general rule, Texas courts should construe points of error liberally
"in order to adjudicate justly, fairly and equitably the rights of the litigants." Williams v. Khalaf,
802 S.W.2d 651, 658 (Tex. 1990). "[A] substantial compliance with these [briefing] rules will
suffice in the interest of justice." Tex. R. App. P. 74(p); see also Weaver v. Southwest Nat'l
Bank, 813 S.W.2d 481, 482 (Tex. 1991).

 One approach that has developed in interpreting points of error may be called the
"inextricably intertwined" approach. This approach allows the appellate court to consider an issue
which has not been specifically mentioned in a point of error, but which is argued under the point,
if the issue is so inextricably intertwined with an issue that is specified in the point of error that
"one cannot be mentioned without automatically directing attention to the other." Consolidated
Eng'g Co. v. Southern Steel Co., 699 S.W.2d 188, 192 (Tex. 1985).

 We think the inextricably intertwined approach is applicable in the present case. 
The trial court expressly identified the jury's alteration-without-consent finding as a basis for
discharging the Keilmans from liability. The trial court did not, however, make any written
findings on the omitted elements of materiality and fraudulent intent. In its point of error, FSB
is clearly complaining about this aspect of the judgment. As indicated previously, the jury's
finding alone is insufficient to support the judgment; rather, the judgment must be based on both
the jury's finding and the deemed findings. Because the deemed findings are not expressly set
forth in any written document, they are necessarily tied to the jury's express finding on the
submitted element of that ground of recovery. In light of the circumstances of the present case,
we conclude, in the interest of justice, that FSB adequately preserved its complaint regarding the
sufficiency of the evidence to support the deemed findings. Accordingly, we will address the
merits of FSB's argument.

 FSB asserts that there is no evidence that the alteration was material. We agree. 
An alteration is material only if it changes the legal effect of the contract. See Oehler v. Scammel,
242 S.W.2d 403, 407 (Tex. Civ. App.--Dallas 1951, writ ref'd n.r.e.) ("An alteration that works
no change, but which leaves the terms of the contract the same as before, does not vitiate it.");
Tyler v. Bauguss, 148 S.W.2d 912, 916 (Tex. Civ. App.--Dallas 1941, writ dism'd judgm't cor.)
(an alteration is material, rendering an instrument void, only if it changes the legal effect of the
contract). The substitution of the number "2%" for "12.5%" did not alter the legal effect of the
note. The note was altered to make the arithmetic number, 12.5%, consistent with the written
words, "prime plus two percent." Regardless of the typed numerals, the written words setting the
interest rate at "prime plus two percent" control the legal interpretation of the note. It is well
settled that unambiguous written words prevail over arithmetic numbers in promissory notes. 
Guthrie v. National Homes Corp., 394 S.W.2d 494, 495 (Tex. 1965). Because the written words
are controlling, FSB's alteration of the incorrectly typed numeral "12.5%" did not alter the legal
effect of the note and, therefore, does not constitute a material alteration.

 Further, the evidence conclusively established that a variable-rate renewal note of
"prime plus 2%" was contemplated by the parties, not a note fixed at 12.5%. Mr. Keilman
admitted at trial that the renewal note was a variable-rate note:



Q: . . . Wasn't your original contract always a floating rate?


A: Floating over two, floating plus two. I think it was twelve and a halfI
don't know.


Q: You don't know? Wasn't that your rate, Frontier prime rate plus two?


A: Correct.


Q: Ever since the loan was first made?


A: Correct. . . .


Q: Does it [the substitution of 2% for 12.5%] vary the note in any way from
what your understanding of what the deal was?


A: Not as far as the percent in there now.


Q: The way it is now, there is nothing in that note that is different from what
you agreed to, is there?


A: Not that I know of.



Mr. Keilman's testimony clearly indicates that he understood the renewal note to be a variable-rate
note of prime plus two percent. Since the alteration did not change the legal effect of the note,
it cannot be classified as a material alteration. Because there is no evidence to support a finding
of materiality, this element cannot be deemed found by the court. Tex. R. Civ. P. 279.

 FSB also asserts that there is no evidence that it acted with fraudulent intent. Even
assuming arguendo that the alteration was material, the Keilmans were required to present
evidence regarding fraudulent intent in order to be discharged from liability under the note on the
basis of the alteration. See Lawler, 538 S.W.2d at 247. The Keilmans presented no such
evidence. Contrary to the Keilmans' assertion, FSB was not required to request a jury instruction
on this issue. Fraudulent intent constitutes an element of the Keilmans' counterclaim; therefore,
they were required to present evidence and secure a finding on the issue. Id.; see also Pinnacle
Homes, Inc. v. R.C.L. Offshore Eng'g Co., 640 S.W.2d 629, 630 (Tex. App.--Houston [14th
Dist.] 1982, writ ref'd n.r.e.). Because there is no evidence to support a finding of fraudulent
intent, this element likewise may not be deemed found by the court. Tex. R. Civ. P. 279. We
sustain FSB's third point of error.




WRONGFUL FORECLOSURE


 In points of error eight through thirteen, FSB complains that the trial court erred
in rendering judgment and awarding damages based on the jury's findings that FSB wrongfully
foreclosed on the property. The Keilmans' wrongful foreclosure claim was based on three
theories: (1) common-law wrongful foreclosure, (2) conspiracy, and (3) violation of the
unconscionability provisions of the Deceptive Trade Practices Act (DTPA), Tex. Bus. & Com.
Code Ann. §§ 17.45(5) (West 1987). We will discuss each theory separately.



1. Common-Law Wrongful Foreclosure

 In point of error eight, FSB complains that the evidence is legally and factually
insufficient to support any finding that FSB wrongfully foreclosed on the property. We agree. 
The Keilmans asserted at trial that FSB "chilled the bidding," i.e., took affirmative steps to
adversely affect the sale price, at the foreclosure. Under Texas law, if a "defect" or "irregularity"
occurs in the foreclosure process which deters third parties from bidding, then a debtor has a
claim against the mortgagee for damages resulting from the "unfair" sale. Pentad Joint Venture
v. First Nat'l Bank, 797 S.W.2d 92, 96 (Tex. App.--Austin 1990, writ denied). Mere inadequacy
of consideration alone, however, does not render a foreclosure sale void if the sale was otherwise
conducted legally and fairly. Tarrant Sav. Ass'n v. Lucky Homes, Inc., 390 S.W.2d 473, 475
(Tex. 1965).

 A mortgagee's duty is to avoid affirmatively deterring prospective bidders by acts
or statements made before or during a foreclosure sale. Pentad Joint Venture, 797 S.W.2d at 96. 
However, "a mortgagee is under no duty to take affirmative action, beyond that required by statute
or the deed of trust, to ensure a `fair' sale." Id. (emphasis added). In other words, a debtor may
recover damages for common-law wrongful foreclosure only if the mortgagee either (1) fails to
comply with statutory or contractual terms, or (2) complies with such terms, yet takes affirmative
action that detrimentally affects the fairness of the foreclosure process.

 The Keilmans assert four alleged irregularities as support for the jury's finding of
wrongful foreclosure: (1) FSB failed to advertise the foreclosure sale in the manner required by
the deed of trust; (2) FSB failed to sufficiently inform prospective bidders regarding the
foreclosure sale; (3) the trustee failed to delay the sale until Mr. Keilman was present; and
(4) FSB included statements in the notice of sale that conflicted with the terms of the deed of trust
and misled prospective bidders.



a. Failure to Advertise

 The deed of trust contained the following clause:



[A]fter advertising the time, place and terms of the sale of the above described and
conveyed property, then subject to the lien hereof, and mailing and filing notices
as required by section 51.002, Texas Property Code, as then amended (successor
to article 3810, Texas Revised Civil Statutes), and otherwise complying with that
statute, the Trustee shall sell the above described property.

 


(Emphasis added.) The Keilmans do not contend that FSB failed to comply with the provisions
of section 51.002; rather, they assert that FSB's posting of the notice at the county courthouse
announcing the time, place, and terms of the upcoming public auction of the mortgaged property
was insufficient to satisfy the requirement in the deed of trust that the sale be "advertised." The
Keilmans argue that the foregoing deed of trust provision specifically required FSB to advertise
the sale by means other than posting, such as advertising in a local newspaper. We disagree.

 If the language of a contract is unambiguous, then a court will construe the
contractual language as a matter of law. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). 
Whether the language of a contract is ambiguous is itself a question of law for the court to decide
by looking at the contract as a whole in light of the circumstances present when the contract was
made. Id. at 394.

 The Texas Supreme Court has adopted the following broad definition of "advertise"
from Black's Law Dictionary (5th ed. 1979):



To advise, announce, apprise, command, give notice of, inform, make known,
publish. On [sic] call to the public attention by any means whatsoever. Any oral,
written, or graphic statement made by the seller in any manner in connection with
the solicitation of business and includes, without limitation because of enumeration,
statements and representations made in a newspaper or other publication or on
radio or television or contained in any notice, handbill, sign catalog, or letter . .
. .



Smith v. Baldwin, 611 S.W.2d 611, 614-15 (Tex. 1980).

 Even though the term "advertise" is very broad, we are not convinced that it is
ambiguous in the present case. While the manner of advertising is not prescribed in the Keilmans'
deed of trust, there is no indication in the record that the parties intended the term to be read in
a narrow sense. Specifically, there is no evidence that FSB obligated itself to engage in one type
of advertising over another. Therefore, the record does not support the Keilmans' bare assertion
that a newspaper ad or similar advertisement was required. The intent of the parties must be taken
from the agreement itself, not from the parties' present interpretation. First City Nat'l Bank v.
Concord Oil Co., 808 S.W.2d 133, 137 (Tex. App.--El Paso 1991, no writ).

 We conclude that, as used in the present circumstances, the term "advertise" is
unambiguous and must be construed broadly. Under such construction, the term clearly includes
the posting of notices in public places. Thus, by posting a notice of the upcoming sale at the
Terrell County courthouse, FSB complied with the "advertising" requirement of the deed of trust. 
Because a mortgagee is under no duty to take affirmative action beyond that required by statute
or deed of trust to ensure a "fair" sale, we conclude as a matter of law that FSB's advertisement
of the foreclosure sale by posting a public notice at the courthouse instead of by other means, such
as placing an ad in a local newspaper does not constitute a defect or irregularity that would give
rise to a claim for damages.



b. Failure to Sufficiently Inform Prospective Bidders

 FSB provided information regarding the foreclosure sale to prospective bidders by
posting the notice of sale at the courthouse. The Keilmans do not contend that information
provided in the notice of sale failed to comply with statutory requirements or the terms of the deed
of trust; rather, they assert that the information provided failed to sufficiently inform prospective
bidders and, therefore, unfairly "chilled the bidding." 

 The Keilmans claimed that the notice provided only a legal description rather than
a street address; that neither the notice nor any other foreclosure document indicated that FSB was
the proper seller; and that the notice obscured sources of possible information because it did not
disclose the address or phone number of FSB or the trustee. Despite the truth of these claims, the
notice was sufficient under Texas law. See Hutson v. Sadler, 501 S.W.2d 728, 731-32 (Tex. Civ.
App.--Tyler 1973, no writ) (notice was sufficient even though posted notice erroneously identified
owner and holder of the note); Myers, 955 F.2d at 350 (under Texas law, posted notice sufficient
despite its failure to advertise specific time of sale, the nature of the property being sold, the
identity of the lender, the address and telephone number of the trustee, and other potential
information which would have enabled potential buyers to learn about the property); see also
Stone v. Watt, 81 S.W.2d 552, 555 (Tex. Civ. App.--Eastland 1935, writ ref'd); Mortimer v.
Williams, 262 S.W. 123, 125 (Tex. Civ. App.--Dallas 1924, no writ). 

 The Keilmans also presented evidence at trial that the notice of sale was tacked on
a cluttered bulletin board, ending up underneath other papers. Although such is the state of many
county courthouse bulletin boards, "[i]f the notices are actually posted the required number of
days prior to the sale, it is not essential that they remain intact and visible during every one of the
intervening days." Chambers v. Lee, 566 S.W.2d 69, 73 (Tex. Civ. App.Texarkana 1978, no
writ). 

 The notice of sale was sufficient under Texas law and the deed of trust imposed no
additional requirements on the mortgagee. Because a mortgagee is under no duty to take
affirmative action beyond that required by statute or deed of trust to ensure a fair sale, we
conclude as a matter of law that the failure to place additional information in the notice does not
constitute a defect or irregularity that would give rise to a claim for damages.



c. Foreclosure Sale in Debtor's Absence

 Mr. Keilman testified that, after waiting for Monroe to appear and begin the
foreclosure sale, he went to the local newspaper office to determine if the sale had been advertised
there; that he authorized his companion, Carl Bierman, to bid up to $16,000; that Monroe came
to the courthouse steps to begin the sale while Keilman was absent; that Bierman asked Monroe
to wait until Keilman returned; that Monroe proceeded with the sale in Keilman's absence; and
that Bierman bid up to $13,000 for the property. The Keilmans argue that Monroe's failure to
delay the sale until Mr. Keilman returned constituted an irregularity that destroyed the legality and
fairness of the sale. We disagree.

 No provision of the deed of trust gave Mr. Keilman the right to be present at the
sale or required Monroe to postpone the sale until he arrived. Under Texas law, the trustee has
no legal duty to wait. See Bering v. Republic Bank of San Antonio, 581 S.W.2d 806, 808 (Tex.
Civ. App.--Corpus Christi 1979, writ ref'd n.r.e.). Moreover, Keilman's agent, Bierman, was
present to bid for him and did bid for him. The fact that Bierman misconstrued his instructions
and did not bid up to $16,000 does not corrupt FSB's actions; the mistake, if any, was chargeable
to the Keilmans.

 Because a mortgagee is under no duty to take affirmative action beyond that
required by statute or deed of trust to ensure a fair sale, we conclude as a matter of law that the
substitute trustee's action in proceeding with the foreclosure sale in Mr. Keilman's absence does
not constitute a defect or irregularity that would give rise to a claim for damages.



d. Statements in the Notice of Sale

 The notice placed by Monroe in the Terrell County courthouse included the
following language: "NO WARRANTIES, EITHER EXPRESSED OR IMPLIED, ARE OR
SHALL BE MADE AS TO MERCHANTABILITY, FITNESS FOR PURPOSE,
WORKMANSHIP OR QUALITY. No policy of title insurance will be furnished to the
purchaser." The Keilmans argue that this statement disclaiming Uniform Commercial Code
("UCC") warranties regarding merchantability, fitness for purpose, workmanship, and quality,
as well as the statement indicating that no title policy would be issued, conflicted with the terms
of the deed of trust and could have misled prospective bidders. Therefore, they argue, FSB's
inclusion of the disclaimers constituted an irregularity invalidating the foreclosure sale. We
disagree.

 The deed of trust provides that if the trustee sells the property, the trustee shall
"make due conveyance to the Purchaser or Purchasers, with general warranty binding Grantors,
their heirs and assigns." The UCC warranties referenced in the notice could apply only to the
improvements on the land. No provision in the notice of sale stated or suggested that the general
warranty of title was being disclaimed, and no provision in the deed of trust requires the trustee
to make, as part of the conveyance, any UCC warranties. Because only the UCC warranties were
disclaimed, the statement in the notice of sale did not conflict with the terms of the deed of trust. Further, no provision in the deed of trust required the trustee to provide the
purchaser with a title policy. Because the deed of trust does not require a title policy, the
statement in the notice of sale that none would be provided did not conflict with the terms of the
deed of trust.

 Further, including the disclaimers did not constitute an affirmative act that "chilled
the bidding." Under Texas law, "[o]ne who bids upon property at a foreclosure sale does so at
his peril." Henke v. First S. Properties, Inc., 586 S.W.2d 617, 620 (Tex. Civ. App.--Waco 1979,
writ ref'd n.r.e.). Statements that UCC warranties are disclaimed as to any improvements on the
property, and that no title policy will be provided, are fully consistent with a prospective bidder's
realistic expectations. We conclude as a matter of law that placing such statements in the public
notice of the foreclosure sale does not constitute a defect or irregularity that would give rise to
a claim for damages.



e. Conclusion

 Of the four "irregularities" identified by the Keilmans, the first three were actually
complaints that FSB did not take additional steps to encourage third party participation in the
foreclosure sale. As stated above, however, the mortgagee is under no duty to take affirmative
action, beyond that required by statute or deed of trust, to ensure such participation. Accordingly,
the first three alleged irregularities do not give rise to a claim for damages. The fourth
"irregularity" identified by the Keilmans complains of FSB's affirmative act in placing disclaimers
in the notice of sale. We concluded above that such disclaimers neither conflicted with the terms
of the deed of trust nor misled prospective bidders. Accordingly, the fourth alleged irregularity
does not give rise to a claim for damages. In the present case, there is no evidence that the
actions of FSB on which the Keilmans base their common-law wrongful-foreclosure claim were
improper. Accordingly, we conclude the record here contains no evidence that the foreclosure
sale was conducted illegally or unfairly.

 Based on the foregoing analysis, we sustain this portion of FSB's eighth point of
error. Because we have concluded that there is no evidence that FSB "chilled the bidding" in the
present case, the Keilmans are not entitled to recover any damages. Accordingly, we need not
reach point of error nine, which raises the issue of whether the debtor has the burden of proving
a gross inadequacy of price in order to recover damages in a "chilled bidding" case. Compare
University Sav. Assn. v. Springwoods Shopping Ctr., 644 S.W.2d 705 (Tex. 1982) (citing the test
established in American Sav. & Loan Assoc. v. Musick, 531 S.W.2d 581 (Tex. 1975), for a suit
seeking damages for wrongful foreclosure), and Charter Nat'l BankHouston v. Stevens, 781
S.W.2d 368 (Tex. App.Houston [14th Dist.] 1989, writ denied).



2. Conspiracy

 The Keilmans asserted at trial that FSB conspired with Monroe to cheat or oppress
the Keilmans by means of the foreclosure sale or to sell their property in a way that would chill
potential bidding. In other words, the Keilmans argue that FSB conspired with Monroe to take
affirmative steps to adversely affect the sale price at foreclosure. The jury found in answer to
Question Fifteen that FSB had engaged in a conspiracy with Monroe, as substitute trustee, "to
breach her duty to the Keilmans in connection with the foreclosure sale." Based in part on this
finding, the trial court held the foreclosure sale to be wrongful and awarded the Keilmans $5,000
in actual damages and $97,000 in exemplary damages. FSB complains, also in point of error
eight, that there was no evidence that it engaged in any unlawful conspiracy with Monroe. We
agree.



a. Law of Conspiracy

 "A civil conspiracy to be actionable must be one unlawful in itself or one
accomplished by unlawful means; it consists of acts which would have been actionable against the
conspirators individually." International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567,
581 (Tex. 1963). The essential elements of a cause of action for conspiracy are: "(1) two or more
persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of
action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." Massey v.
Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983) (emphasis added). Thus, where the purpose
to be accomplished is lawful and no unlawful means are used, there can be no civil conspiracy. 
Kingsberry v. Phillips Petroleum Co., 315 S.W.2d 561, 576 (Tex. Civ. App.--Austin 1958, writ
ref'd n.r.e.); see also First Interstate Bank v. S.B.F.I., Inc., 830 S.W.2d 239, 249 (Tex.
App.--Dallas 1992, no writ) ("[D]isconnected circumstances, any one of which, or all of which,
are just as consistent with lawful purpose as with unlawful undertaking, are insufficient to
establish conspiracy.").


b. Duty of Trustee

 Under Texas law, the trustee's duty is to act with "absolute impartiality and
fairness" to all concerned, including the mortgagor. Hammonds v. Holmes, 559 S.W.2d 345, 347
(Tex. 1977). However, a trustee does not owe a fiduciary duty to the mortgagor. See FDIC v.
Myers, 955 F.2d 348, 350 (5th Cir. 1992). The Keilmans cite American Savings & Loan
Association v. Musick, 517 S.W.2d 627 (Tex. Civ. App.Houston [14th Dist.] 1974), rev'd on
other grounds, 531 S.W.2d 581 (Tex. 1975), for the proposition that a deed of trust creates a
fiduciary relationship between the trustee and mortgagor. While the court in that case did use the
phrase "fiduciary relationship," the opinion clearly indicates that the duty owed is simply a duty
to strictly comply with the terms of the deed of trust. 517 S.W.2d at 631; see also University Sav.
Ass'n, 644 S.W.2d at 706. In other words, a trustee fulfills his duty to act with impartiality and
fairness by strictly complying with the terms of the deed of trust.



c. Evidence of Conspiracy

 FSB argues that there is no evidence to establish that it conspired with Monroe to
chill the bidding or otherwise cheat or oppress the Keilmans. We agree.

 The Keilmans point to nine instances in the record that allegedly support the jury's
finding of conspiracy: (1) Monroe denied owing any duty to the Keilmans; (2) Monroe did not
conduct an independent investigation prior to foreclosure; (3) Monroe failed to advertise the
foreclosure sale; (4) the notice of sale did not provide adequate information to prospective bidders;
(5) the disclaimers contained in the notice of sale misled prospective bidders; (6) Monroe
conducted the sale in Mr. Keilman's absence; (7) Monroe's commission was not paid out of sale
proceeds; (8) FSB's books show the debt was satisfied by foreclosure; and (9) FSB's past
foreclosure practices demonstrate a pattern of abuse. Because the jury question, as worded, did
not identify any particular act of conspiracy, we will address each of the instances asserted by the
Keilmans.

 (1) The Keilmans argue that Monroe denied owing the Keilmans any duty as trustee
in the foreclosure sale, and that such denial constitutes evidence of a conspiracy. Actually,
Monroe testified that she was not sure what her duty to the Keilmans consisted of; she simply
maintained that she thought her duty was to comply with the terms of the deed of trust. The
record contains no evidence that Monroe violated any terms of the deed of trust, nor that she
misconstrued or misrepresented her duties thereunder.

 (2) The Keilmans presented evidence at trial that Monroe used documents prepared
by FSB without conducting an independent investigation of the property and that she made no
effort to determine the value of the property or what would constitute a reasonable bid. The terms
of the deed of trust, however, imposed no such duty, and the record contains no evidence that
Monroe was obligated to take such action. Further, any investigation of the property or
determination of a reasonable bid based on the property value would not alter the trustee's action
at the foreclosure sale. The trustee is required to sell the property "to the highest bidder for
cash." By doing so, Monroe complied with the terms of the deed of trust and fulfilled her duty
to the Keilmans.

 (3) As discussed above, Monroe adequately complied with her duty to "advertise"
the sale. Posting the notice of sale at the courthouse was sufficient under the deed of trust.

 (4) As discussed above, the information provided in the notice of sale was sufficient
to inform prospective bidders. Because the notice of sale was sufficient under Texas law, we
conclude as a matter of law that its failure to contain additional information does not constitute
any evidence of an unlawful conspiracy to chill the bidding.

 (5) As discussed above, the disclaimers included in the notice of sale were not
contrary to law or the terms of the deed of trust and were fully consistent with a prospective
bidder's realistic expectations. Such statements provide no evidence of an unlawful conspiracy.

 (6) As discussed above, Monroe was under no legal duty to wait for Mr. Keilman
before conducting the foreclosure sale. Further, the Keilmans were not harmed by this act
because a representative with authority to bid for the Keilmans was present and did in fact bid on
the property.

 (7) The Keilmans presented evidence at trial showing that Monroe was paid by FSB
directly rather than out of the foreclosure-sale proceeds. Although the deed of trust provides that
the trustee will be paid out of sale proceeds, Monroe did not violate any duty to the Keilmans by
accepting payment from FSB directly, and FSB did not violate any duty to the Keilmans by paying
Monroe directly. On the contrary, FSB's actions actually reduced the Keilmans' deficiency
further, because FSB credited the full amount of its bid to the balance due on the Keilmans' note.

 (8) The Keilmans asserted at trial that, after foreclosing, FSB credited the value of
the property against the full amount of the Keilmans' note, showing a "wash" on its asset ledgers. 
However, undisputed testimony established that, under FSB's accounting procedures, it routinely
transferred the full amount of a loan from the loan account to the "other real estate" account. 
Further undisputed testimony demonstrated that the Keilmans defaulted on their note, that FSB
had the right to foreclose, and that the $13,200 bid on the property did not equal or exceed the
principal and interest owed on the note. Regardless of whether FSB's accounting procedures were
consistent with generally accepted accounting principles or banking regulations, FSB was entitled
by law to calculate the deficiency owed by deducting the bid price from the outstanding debt. See
Savers Fed. Sav. & Loan Ass'n v. Reetz, 888 F.2d 1497, 1503 (5th Cir. 1989) ("We conclude
under controlling and long-established Texas law that where there has previously been a valid
nonjudicial deed of trust foreclosure on real property securing a debt, the amount to be credited
on the debt for deficiency judgment purposes is the amount received at the foreclosure sale."). 
Such accounting procedures do not constitute evidence of a conspiracy between FSB and Monroe.

 (9) Finally, the Keilmans presented evidence at trial regarding other FSB
foreclosures conducted in the eighteen months preceding the foreclosure at issue in the present
case. The evidence demonstrated that FSB acquired the properties for a bid price less than the
loan amount. The evidence failed, however, to provide any information about the circumstances
surrounding the foreclosures (e.g., whether the debt exceeded the value of the property, whether
the property was the sole collateral securing the loan, or whether additional collateral secured the
loan). Accordingly, evidence that FSB bid less than the loan amount in other cases, standing
alone, does not give rise to an inference that FSB engaged in a pattern of abuse that would
constitute evidence of conspiracy.



e. Conclusion

 The mere fact that Monroe accepted a bid below the loan amount and that FSB
acquired the property for less than the loan amount is not evidence of conspiracy. Neither
Monroe, as trustee, nor FSB, as mortgagee, engaged in any action that breached any duty owed
to the Keilmans. The evidence demonstrates that Monroe strictly complied with the terms of the
deed of trust in acting as trustee at the foreclosure sale. In short, all actions taken by Monroe and
FSB were lawful acts. Further, their purpose was not shown to be unlawful. There is no
evidence that FSB's purpose was anything other than to foreclose its lien on a property securing
a loan that was in default. Nor is there any evidence that Monroe's purpose was anything other
than to comply with the terms of the deed of trust in acting as trustee and conducting the
foreclosure. We conclude that the record contains no evidence of an unlawful conspiracy between
Monroe and FSB. Accordingly, we sustain this portion of FSB's eighth point of error.



3. Unconscionability

 In point of error eleven, FSB complains that the evidence is legally and factually
insufficient to support the jury's finding that FSB engaged in any unconscionable act in connection
with the foreclosure sale that was a producing cause of damages. We agree.

 As discussed above, to invalidate a foreclosure sale the debtor must prove that some
defect or irregularity in the foreclosure process caused or contributed to cause the property to be
sold for a grossly inadequate price. Pentad Joint Venture, 797 S.W.2d at 96. Inadequacy of
consideration alone does not render a foreclosure sale void if the sale was legally and fairly made. 
Lucky Homes, Inc., 390 S.W.2d at 475. In light of these well-established rules, a general finding
of unconscionability under the DTPA does not necessarily prove that the foreclosure sale was
wrongful.

 The DTPA defines "unconscionable action or course of action" as



an act or practice which, to a person's detriment:


(A) takes advantage of the lack of knowledge, ability, experience, or capacity of
a person to a grossly unfair degree; or


(B) results in a gross disparity between the value received and consideration paid,
in a transaction involving transfer of consideration.



Tex. Bus. & Com. Code Ann. § 17.45(5) (West 1987).

 The question submitted to the jury in the present case did not require them to
specify whether they found FSB to have acted unconscionably under subsection (A) or subsection
(B) of section 17.45(5). In their brief to this Court, however, the Keilmans assert that we should
review "the evidence of wrongful foreclosure and conspiracy for proof that FSB took advantage
of the Keilmans' lack of knowledge, ability or capacity to a grossly unfair degree." Because we
have determined that FSB did not wrongfully foreclose or conspire against the Keilmans, we
conclude that, under the facts of this case, the evidence is insufficient to establish
unconscionability under subsection (A). (2)

 A finding under subsection (B), on the other hand, is simply insufficient to establish
wrongful foreclosure. Again, inadequacy of consideration alone does not invalidate a foreclosure
sale that was legally and fairly made. Because the record contains no evidence of a defect or
irregularity that caused or contributed to cause the sale of the property for a grossly inadequate
price, a jury finding of unconscionability under subsection (B) is insufficient to support a
judgment for wrongful foreclosure. We sustain point of error eleven.

 In point of error ten, FSB complains that the trial court erred in awarding $5,000
damages based on the Keilmans' independent DTPA unconscionability claim, arguing that the
Keilmans do not qualify as consumers under the DTPA. Although the Keilmans pleaded an
independent cause of action for violation of the DTPA, the trial court apparently did not award
damages on this basis; the court did not treble the first $1,000 of the jury's $5,000 damage
verdict, as would have been required under the DTPA. See Tex. Bus. & Com. Code Ann.
§ 17.50(b)(1) (West Supp. 1992). Accordingly, we presume that the trial court's award of $5,000
in actual damages was for wrongful foreclosure based on the Keilmans' common-law and
conspiracy theories, and was not an award under the DTPA.

 If, however, the trial court did intend to base its award of damages on the
Keilmans' independent DTPA claim, we agree with FSB's contention that the Keilmans did not
qualify as consumers under the DTPA. Only a "consumer" may maintain a cause of action for
damages and attorney's fees under the DTPA. Flenniken v. Longview Bank & Trust Co., 661
S.W.2d 705, 706 (Tex. 1983). The DTPA defines consumer as "an individual . . . who seeks or
acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code Ann. § 17.45(4)
(West 1987). To show their consumer status, the Keilmans argue that they purchased foreclosure
services to be performed by the trustee named in the deed of trust. The basis for this assertion
is the following standard-form language in the deed of trust: "[O]ut of the money arising from
such [foreclosure] sale, the Trustee acting shall pay . . . a commission of five percent (5%) to
himself." We conclude that, in this transaction, the foregoing provision does not make the
Keilmans consumers under the DTPA.

 Under Texas law, an extension of credit alone does not confer consumer status
under the DTPA. See Riverside Nat'l Bank v. Lewis, 603 S.W.2d 169, 175 (Tex. 1980);
Briercroft Serv. Corp. v. Del Los Santos, 776 S.W.2d 198, 206 (Tex. App.--San Antonio 1988,
writ denied); Thomas C. Cook, Inc. v. Rowhanian, 774 S.W.2d 679, 681 (Tex. App.--El Paso
1989, writ denied). This rule has also been applied in the context of an extension of credit
secured by property. See Smith v. United States Nat'l Bank of Galveston, 767 S.W.2d 820, 824
(Tex. App.--Texarkana 1989, writ denied); Briercroft Serv. Corp., 776 S.W.2d at 206; FSLIC v.
Kralj, 968 F.2d 500, 507 (5th Cir. 1992). The Keilmans' purpose in obtaining this loan was to
secure an extension of credit. The property securing the loan was already owned by the Keilmans
and simply provided additional collateral for the loan of money.

 Further, the commission payable to the trustee in the context of the facts of this
case did not constitute the purchase of a "service" under the DTPA. As the U.S. Court of
Appeals for the Fifth Circuit observed,



[A]ll transactions involve human service to some extent, the cost of which is
included in the price of the transaction. Arguably, then, all services in any
transaction are purchased "services" under the DTPA. Under this approach, any
service involved in a . . . loan transaction would give rise to DTPA consumer
status even though the actual . . . loan could not . . . .



FDIC v. Munn, 804 F.2d 860, 863-64 (5th Cir. 1986). The Munn court specifically rejected this
"all services" approach to defining consumer status under the DTPA. Rather, the court held that
the key principle in determining consumer status is that the goods or services purchased must be
an objective of the transaction, not merely incidental to it. Id. at 865. We agree.

 Under the facts of the present case, the objective of the transaction was the
extension of credit. The provisions of the deed of trust detailing foreclosure procedures
constituted a remedial measure applicable solely in the event of default. We conclude that the
provision providing for the trustee's commission was, as a matter of law, an incidental provision
to cover the costs of foreclosure; it was not an objective of the transaction. 

 Because the payment of a trustee's commission did not constitute a service under
the DTPA, we conclude as a matter of law that the Keilmans were not consumers under the
DTPA. We sustain point of error ten.

 FSB also complains in point of error ten that the so-called D'Oench, Duhme
doctrine and related doctrines barred the Keilmans' DTPA claim. See D'Oench, Duhme & Co.
v. FDIC, 315 U.S. 447 (1942). Because we have concluded that the Keilmans are not consumers
and, therefore, cannot recover under the DTPA, we do not address this issue.




4. Damages

 In points of error twelve and thirteen, FSB complains of the amount of damages
awarded on the basis of wrongful foreclosure. Because we have concluded that the foreclosure
was not wrongful, we need not reach these complaints.



USURY


 In points of error four, five, and six, FSB attacks the sufficiency of the evidence
to support the jury's finding of usury. Usury is defined as "interest in excess of the amount
allowed by law." Tex. Rev. Civ. Stat. Ann. art. 5069-1.01(d) (West 1987). Interest is defined
as "compensation allowed by law for the use or forbearance or detention of money." Id. at 5069-1.01(a). The Keilmans assert that the trial court correctly rendered judgment that FSB committed
usury based on: (1) McKennon's demand letter; (2) wrongful foreclosure; and (3) interest charged
after the FDIC closed Frontier. We will address each asserted basis separately.


1. McKennon's Demand Letter

 The trial court assessed $2,000 in statutory usury penalties against FSB on the basis
of the jury's finding that FSB charged $360 in unauthorized interest in McKennon's demand letter
dated April 25, 1989. FSB complains in points of error four and five that the evidence is both
legally and factually insufficient to support this finding. FSB claims that the letter does not
constitute a basis for a usury claim. McKennon's letter stated that "[t]he past due amount as of
April 25, 1989, is $12,669.92, plus interest as provided in the Note."

 When both legal and factual sufficiency points are raised, we must first examine
the legal sufficiency of the evidence. Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401
(Tex. 1981). If there is any evidence of probative value supporting the finding, we must uphold
the jury's finding against a legal sufficiency challenge. In re King's Estate, 244 S.W.2d 660, 661
(Tex. 1951). After considering only that evidence favoring the jury's verdict, we conclude that
the Keilmans introduced more than a scintilla of evidence at trial to support their claim that FSB
charged unauthorized interest and provided a basis for estimating the amount of unauthorized
interest charged. Accordingly, FSB's legal sufficiency challenge must fail. Cf. Carrow v.
Bayliner Marine Corp., 781 S.W.2d 691, 695 (Tex. App.--Austin 1989, no writ).

 Although we have determined that there was some evidence presented to support
the Keilmans' claim that FSB charged unauthorized interest, we must weigh and consider all the
evidence, both in support of and contrary to the jury's finding, to determine whether it was
factually sufficient to support the jury's finding that FSB charged $360 in unauthorized interest. 
See In re King's Estate, 244 S.W.2d at 661. The jury's finding must be upheld unless it is so
against the great weight and preponderance of the evidence as to be manifestly unjust and
erroneous. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); see also Pool v. Ford Motor Co.,
715 S.W.2d 629, 635 (Tex. 1986). 

 The Keilmans claimed at trial that the entire sum of $12,669.92 must have been a
demand for interest. Mr. Keilman testified that FSB had orally agreed to allow the Keilmans to
make interest-only payments. The Keilmans conceded that, at the time the demand letter was sent,
$5,508.48 (3) in interest was past due under the terms of the note. Based on this evidence, the
Keilmans argued that FSB charged $7,161.44 in excess interest and that the charging of such
interest constituted usury. 

 On the other hand, FSB's loan officer, Roy Touchstone, testified that the oral
agreement with the Keilmans allowed interest-only payments provided that all payments were
made timely. Because the Keilmans were in default, a principal payment as provided in the
renewal note was due. The evidence showed that the renewal note provided for a $12,500
principal reduction on January 5, 1989; that the Keilmans were in default on their note by March
1989; and that FSB demanded a payment of $12,669.92 in April 1989. Further, Touchstone
testified that although he could not explain exactly how McKennon calculated the demand for
$12,669.92, $12,500 of the amount could have been a demand for the principal due under the
terms of the renewal note and the remaining $169.92 could have been a demand for interest on
that principal.

 The jury's finding that FSB charged $360 in unauthorized interest was not an award
of damages per se. This finding, however, if supported by evidence, entitled the trial court to
assess statutory usury penalties. Because this finding was essential to an award of such penalties,
the case law developed in connection with the jury's discretion in awarding damages is relevant
to our disposition of the points of error at issue.

 As a general rule, the trier-of-fact has broad discretion in assessing damages where
the law provides no precise legal measure, and the jury's findings will not be disregarded merely
because the jury's reasoning in arriving at its figures may be unclear. Adams v. Petrade Int'l,
Inc., 754 S.W.2d 696, 710 (Tex. App.--Houston [1st Dist.] 1988, writ denied). 

 A jury may not, however, arbitrarily assess an amount neither authorized nor
supported by the evidence presented at trial. Mills v. Jackson, 711 S.W.2d 427, 434 (Tex.
App.Fort Worth 1986, no writ); Qualls v. Miller, 414 S.W.2d 746, 748-49 (Tex. Civ.
App.--Texarkana 1967, writ dism'd). In other words, a jury may not "pull figures out of a hat";
a rational basis for calculation must exist. Neiman-Marcus Group, Inc. v. Dworkin, 919 F.2d
368, 372 (5th Cir. 1990). A jury's finding may be disregarded if the amount assessed "was not
the result of a deliberate and conscientious conviction in the minds of the jury and the court." 
Mills, 711 S.W.2d at 431. The jury must engage in "an honest endeavor to ascertain damages
sustained in light of the attendant facts and conditions." General Motors Corp. v. Grizzle, 642
S.W.2d 837, 845 (Tex. App.--Waco 1982, writ dism'd).

 In the present case, if the jury believed the evidence presented by the Keilmans,
$7,161.44 in unauthorized interest was charged. If the jury believed the evidence presented by
FSB, only $169.92 in interest was charged, none of which was unauthorized. The jury, however,
found that $360 of the amount demanded was for unauthorized interest. None of the parties could
explain exactly how the jury arrived at that figure. FSB cannot explain how this sum was
calculated. Further, the Keilmans offer no explanation to support the jury's finding. In fact, after
receiving the jury's verdict, the Keilmans moved the trial court to disregard this jury finding:



The Court should disregard the jury's answer to Written Question No. 11 because
there is no evidence to support the jury's finding that the amount of unauthorized
interest charged in McKennon's demand letter was $360. The uncontroverted
evidence was that McKennon demanded $12,669.92 on April 25, 1989, when only
$5508.48 was past due at that time, leaving an unauthorized overcharge of
$7161.44.



Although the Keilmans do not raise this issue in a crosspoint on appeal, this statement clearly
indicates that the Keilmans consider the jury's finding inexplicable. (4)

 We conclude that the jury's finding of $360 in unauthorized interest is inexplicable
in light of the evidence presented at trial. There is no rational basis for the jury's calculation. 
Except for the fact that the jury's figure falls in between the Keilmans' $7,161.44 figure and
FSB's $0 figure, it appears that the jury pulled its answer out of a hat. The evidence presented
by both the Keilmans and FSB provided a relatively precise method for calculating unauthorized
interest. The jury was entitled to believe FSB and find that it charged no unauthorized interest. 
Alternatively, the jury was entitled to believe the Keilmans and find that FSB charged $7,161.44
(or a sum closely related) in unauthorized interest. In reviewing the evidence presented and in
light of relevant case law, we conclude that the evidence presented was factually insufficient to
support a finding that FSB charged $360 in unauthorized interest. See Clark v. Brewer, 471
S.W.2d 639, 642 (Tex. Civ. App.--Corpus Christi 1971, no writ) (the court remanded the case,
stating that "We are unable to take any group of specific figures and come up with the figure
found by the jury. The defendant-appellee does not suggest any such figure"). Accordingly, we
sustain that portion of FSB's fourth and fifth points of error complaining of the factual sufficiency
of the evidence to support the jury's finding that the McKennon letter charged $360 in
unauthorized interest. We reverse the judgment of the trial court awarding $2,000 in statutory
damages based on this finding and remand this portion of the cause for further proceedings. (5)


2. Wrongful Foreclosure

 In addition to awarding damages to the Keilmans, the trial court rendered judgment
that FSB forfeit all principal under the renewal note based on the Keilmans' wrongful-foreclosure/usury theory. FSB complains in points of error four and five that the Keilmans' claim
of usury cannot be supported by wrongful foreclosure. We agree. The Keilmans asserted at trial
that FSB received and charged unlawful interest as a result of the wrongful foreclosure. The basis
of this assertion is that FSB acquired the property at the foreclosure sale for less than fair market
value and then pursued a deficiency claim on the remaining debt. The Keilmans argued that the
market value of the property received by FSB, in addition to the value of the deficiency claim
pursued, constituted a charge of excessive compensation for the loan of money.

 We concluded above that the evidence was legally insufficient to support the finding
that FSB's foreclosure of the property securing the Keilmans' loan was wrongful. This
foreclosure took place in 1989, before the enactment of section 51.003 of the Property Code, Tex.
Prop. Code Ann. § 51.003 (West Supp. 1992). (6) The controlling case law at the time of this
foreclosure provided that, in a properly conducted foreclosure sale, the amount to be credited
against the debt is the purchase price, not the fair market value; moreover, the mortgagee is
entitled to pursue the remaining deficiency. See Lucky Homes, Inc., 390 S.W.2d at 475; Reetz,
888 F.2d at 1504. Because the foreclosure was not wrongful, FSB properly credited the purchase
price against the debt and calculated the deficiency accordingly. In other words, FSB calculated
the deficiency as it was entitled to by law. Therefore, FSB did not demand excessive
compensation for a loan of money.

 The trial court relied on the jury's findings of usury resulting from wrongful
foreclosure as a basis for (1) awarding $291,000 in statutory usury penalties, and (2) rendering
judgment that the Keilmans were discharged from liability (7) and that FSB forfeit all principal under
the renewal note based on the relevant usury statute. See Tex. Rev. Civ. Stat. Ann. art. 5069-1.06(2) (West 1987). We conclude that, in the circumstances of the present case, wrongful
foreclosure is not a valid basis for usury.



3. Interest Charges After Frontier's Closing

 FSB complains in point of error six that the trial court's conclusion that FSB
charged double usury after the FDIC closed Frontier is legally erroneous. The Keilmans asserted
at trial that after the FDIC closed Frontier no agreement existed as to the interest rate of the
renewal note, and, accordingly, the usury statute imposed a 6% interest rate. See Tex. Rev. Civ.
Stat. Ann. art. 5069-1.03 (West 1987). To the extent that this point of error complains that the
trial court rendered judgment based on the theory that FSB charged double the statutorily imposed
6% interest rate, we need not address this issue. Although the jury found that there was no
agreement of a specified interest rate after Frontier was closed, the trial court did not render
judgment based on this finding. The Keilmans concede that this point of error is not an issue on
appeal; therefore, we do not address it.

 We sustain points of error four and five.

 In point of error seven, FSB complains of the jury instructions provided in
connection with the Keilmans' usury claim. In light of our holding that the Keilmans are not
entitled to recover on their usury claim, we need not address this issue.



ATTORNEY'S FEES


 In point of error fourteen, FSB complains that the trial court erred in awarding
attorney's fees based on Keilmans' DTPA and usury claims. Because we have reversed the trial
court's judgment under both theories, we sustain point of error fourteen.



FSB'S DEFICIENCY CLAIM


 In points of error one and two, FSB complains that the evidence is legally and
factually insufficient to support the jury's findings as to principal and interest owing and that FSB
conclusively established the amounts due. The trial court rendered judgment that FSB take
nothing by its deficiency claim. The trial court based its judgment on the jury's findings that FSB
materially altered the renewal note and committed usury. Because we have concluded above that FSB did not materially alter the note or commit usury, we sustain points of error one
and two. The only question remaining is whether we should remand FSB's deficiency cause of
action or render judgment for a particular sum in favor of FSB. 

 FSB requests that we render judgment in its favor. However, because of
inadequately developed testimony and insupportable jury findings as to principal and interest
owing, we conclude that this cause should be remanded in the interest of justice. See Tex. R.
App. P. 81(c); U.S. Fire Ins. Co. v. Carter, 473 S.W.2d 2 (Tex. 1971); Bain v. City of Temple,
428 S.W.2d 823 (Tex. Civ. App.--Austin 1968, writ ref'd n.r.e.).

 Our discussion above is dispositive as to point of error fifteen, which complains
of the trial court's failure to award attorney's fees to FSB based on its deficiency claim. Because
we remand this cause, FSB is not yet entitled to an award of attorney's fees; accordingly, we
overrule point of error fifteen.



CONCLUSION


 We reverse that portion of the trial court's judgment awarding damages and other
relief pursuant to the Keilmans' counterclaims. We render judgment that the Keilmans take
nothing on their material-alteration and wrongful-foreclosure counterclaims. As to the Keilmans'
usury counterclaims, we render judgment that the Keilmans take nothing on their usury-by-wrongful-foreclosure counterclaim; as to the Keilmans' usury claim based on McKennon's demand
letter, we remand that portion of the cause to the trial court for further proceedings. Finally, we
reverse that portion of the trial court's judgment decreeing that FSB take nothing on its deficiency
claim, and we remand that portion of the cause for further proceedings.




 

 J. Woodfin Jones, Justice

[Before Justices Powers, Jones and Kidd]

Reversed and Rendered in Part; Reversed and Remanded in Part

Filed: March 31, 1993

[Publish]
1. The trial court's final judgment decreed


that the Note and any renewal or extension thereof is void and without effect
and that the Defendants have no liability thereunder under TEX. REV. CIV.
STAT. art. 5069-1.06(2) [prohibiting the charging of usurious interest] and the
common law. This order is based on the jury's answer to Question No. 6
[alteration of the renewal note without consent] and Questions Nos. 12 and 13
[usury by wrongful foreclosure].


The trial court based its judgment on the jury's findings of alteration without consent and
usury by wrongful foreclosure. The Keilmans agree in their brief to this Court that the jury's
finding of alteration provides an alternative basis, along with usury, for the trial court's
judgment. This portion of our opinion applies only to that portion of the judgment that
purports to void the note on the basis of a material-alteration theory. The portion of the
judgment discharging the Keilmans from liability on the basis of usury is discussed fully in the
usury section of this opinion.

2. We do not address the issue of whether a finding under the language of subsection (A)
could ever support a judgment for wrongful foreclosure. We simply focus on the facts
presented in this case.
3. In their brief, the Keilmans indicate that $5,509.28 was due and owing at the time the
demand letter was sent. The difference between these two sums is insignificant and irrelevant
to our disposition of the points of error at issue.
4. An amicus brief filed herein by the Texas Savings and Loan League stated: "How the
jury came up with the $360 number as the answer to Question 11 is beyond comprehension." 
5. Even if we were to determine that there was a complete absence of evidence to support
the jury's $360 figure, we would be inclined to remand this portion of the cause in the interest
of justice. See Tex. R. App. P. 81(c); U.S. Fire Ins. Co. v. Carter, 473 S.W.2d 2 (Tex.
1971); Bain v. City of Temple, 428 S.W.2d 823 (Tex. Civ. App.--Austin 1968, writ ref'd
n.r.e.).
6. Section 51.003 provides that if a court determines that the fair market value of the
foreclosed property is greater than the foreclosure sale price, the deficiency is reduced by the
difference between the fair market value and the bid price, regardless of whether the
foreclosure sale was regularly or irregularly conducted. However, the effective date of this
new law was April 1, 1991, after the foreclosure at issue in this case. We do not address what
the result would have been had section 51.003 been applicable.
7. In the portion of the judgment voiding the note, the trial court indicated that, based on
article 5069-1.06(2), the Keilmans have no liability under the renewal note.