In The
Court of Appeals
For The
First District of Texas
_______________

NO. 01-99-00428-CV
____________

MARK SWANK; MARVIN CHUDNOFF; JEFFREY SUSSMAN; LOUIS
DREYFUS NATURAL GAS HOLDINGS; L.D.E. ASSOCIATES, L.L.C.;
AND JAMES McCOY, JR., Appellants/Appellees

V.

ANATOLY SVERDLIN, INDIVIDUALLY AND DERIVATIVELY ON
BEHALF OF AUTOMATED MARINE PROPULSION SYSTEMS, INC.,
Appellees/Appellants




On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 97-02103




O P I N I O N
          In this commercial dispute, Mark Swank, Marvin Chudnoff, Jeffrey Sussman,
Louis Dreyfus Natural Gas Holdings Corp., L.D.E. Associates, L.L.C., and James
McCoy, Jr. appeal a judgment in favor of Anatoly Sverdlin individually and
derivatively on behalf of Automated Marine Propulsion, Systems, Inc.


 We reverse
and render.Background
          Anatoly Sverdlin, an engineer, came to Houston in 1974, after defecting from
the Soviet Union. In 1977, he started his own business, Automated Marine
Propulsion Systems, Inc. (“AMPS”), which primarily repaired diesel marine engines
on large ships. Sverdlin was the sole owner and chief executive officer (“CEO”) of
AMPS. Between 1992 and 1994, AMPS’s net income was approximately $110,000. 
Thereafter, Sverdlin developed and secured a series of three patents for a new fluid
control injection system (“FCIS”), which allegedly improved engine efficiency and
lowered costs. Sverdlin obtained certification from several international marine
classification societies to enable owners of oceangoing vessels with FCIS to obtain
insurance. FCIS was installed on numerous engines and underwent testing in Japan
at the end of 1994. To further develop the FCIS, AMPS shifted its focus away from
engine repairs, and in 1995, the company began to operate at a loss. AMPS lost over
$125,000 in 1995. Sverdlin obtained a bank loan, but additional capital was required. 
A business plan was needed to attract investors. 
          In early 1995, James McCoy was hired as vice-president of industrial sales to
promote FCIS. A few months later, Mark Swank was hired as president of AMPS to
develop a business plan to attract investors. Swank and McCoy each received a
salary and yearly stock options, the total of which was not to exceed 20% each. 
          Swank prepared a five-year financial projection of AMPS’s potential net
income, assuming FCIS was successful. The projections, based on a 1% market
share, estimated that AMPS would receive approximately $120 million in revenue
over five years, which would result in approximately $50 million in post-tax revenue
for AMPS.


 In late 1995, McCoy introduced Sverdlin to an investor, Marvin
Chudnoff. Chudnoff was interested in investing in AMPS, and he recruited
additional investors.
          Chudnoff and three other individuals created AMPS Investment, L.L.C. 
Subsequently, AMPS Investment, L.L.C. created L.D.E. Associates, L.L.C. (“LDE”),
through which AMPS Investment, L.L.C. and Louis Dreyfus Natural Gas Holdings
Corp. (“LDNGH”) invested in AMPS. Jeffrey Sussman, one of AMPS Investment,
L.L.C.’s members, signed documents as LDE’s president. 
          Lengthy negotiations ensued over several months regarding a deal for AMPS
to obtain a $2 million loan from LDE to continue development and marketing of
FCIS. During the negotiations, Chudnoff often spoke on behalf of the investors, and
Swank often spoke on behalf of AMPS.


 
          A letter agreement was signed on June 6, 1996 (“the June Letter Agreement”).
Sverdlin testified that he did not read the June Letter Agreement when he signed it,
and its terms were not what he was led to believe. However, both Sverdlin and his
wife, the directors of AMPS at the time, signed a statement giving the AMPS board’s
approval to the June Letter Agreement. 
          The parties continued to negotiate the agreement through September. The
investors conducted due diligence on AMPS and hired an engineering firm to
evaluate AMPS and FCIS. The due diligence investigations revealed that a few terms
in the September contracts varied slightly from those in the June Letter Agreement. 
The parties signed a series of related documents and finalized the transaction at the
end of September 1996. Sverdlin chose not to read the documents prior to signing
them because he had to catch an overseas flight. 
          Under the loan agreement, LDE had the right to choose two of the three
directors at AMPS. Chudnoff and Sussman became such directors. Shortly
thereafter, FCIS did not function as expected, AMPS lost money, and the parties
began to disagree. Appellants testified that Sverdlin became hostile to employees and
customers, blaming them for FCIS’s problems. In mid-December, appellants asked
Sverdlin to concentrate on engineering concerns and to not speak to customers. 
Sverdlin testified that the board of directors stopped listening to him, intervened in
AMPS’s business operations, and took control of the company, causing it to go into
disarray and become unmanageable. The situation continued to escalate. 
          After several board meetings and discussions, the parties could not agree on
how to run AMPS and could not work together. Sverdlin insisted the company would
not survive without him. He threatened to fire Swank and McCoy and take back his
patents. 
          Swank and McCoy exercised their stock options in AMPS. The AMPS board
determined that Sverdlin’s conduct was damaging the company in violation of his
employment agreement. They terminated his employment with AMPS on January 16,
1997. The company had been operating at a loss. AMPS’s net income after taxes in
1996 revealed over half a million dollars in losses. AMPS borrowed additional
money directly from LDNGH. 
          After his termination, Sverdlin and the AMPS board continued to disagree. 
AMPS and LDE obtained a temporary restraining order, and, subsequently, a
temporary injunction against Sverdlin enjoining him from: physically threatening
AMPS’s officers and employees; contacting customers to disparage its business;
entering the premises of AMPS and disrupting its activities; taking AMPS
equipment/technology/customer lists; contacting marine classification societies in
connection with AMPS; or terminating AMPS’s directors and employees. 
          Sverdlin filed a counterclaim individually and on behalf of AMPS in his
derivative capacity seeking declaratory relief and alleging numerous causes of action,
including fraud, breach of contract, breach of fiduciary duty, negligence, gross
negligence, conspiracy, tortious interference, and usury. Sverdlin asserted that he
was never informed about certain aspects of the negotiations and did not understand
the documents he had signed. Subsequently, the trial court modified the injunction
to freeze all of the parties’ contractual rights related to the June and September 1996
agreements and appointed a receiver to oversee AMPS’s operations. Thus, the
documents were frozen in escrow. The trial court also realigned the parties by
making Sverdlin and AMPS the plaintiffs. 
          Sverdlin had sued Gardere Wynne and one of its attorneys, David Jungman,
alleging malpractice based on conflicts of interest. Those claims were settled for a
confidential amount. The jury awarded approximately $1.5 billion to Sverdlin and
AMPS. Following several post-verdict hearings, the Honorable Judge Dwight
Jefferson disregarded numerous findings, reduced the verdict to approximately $235
million in damages, and returned the patents and 100% of AMPS’s stock to Sverdlin. 
After Judge Jefferson resigned, the case was transferred to the Honorable Judge Tracy
Christopher. After several post-judgment hearings, Judge Christopher remitted a
portion of the punitive damages, further reducing the judgment to approximately $180
million. 
Standards of Review
          Many of appellant’s issues assert that the evidence is legally and factually
insufficient to support many of the jury findings. 
          We follow the usual standards of review. In reviewing a legal sufficiency
challenge, we consider all the evidence in the light most favorable to the verdict and
indulge every reasonable inference deducible from the evidence in the prevailing
party’s favor. Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997). In reviewing a factual sufficiency challenge, we consider all the evidence both
supporting and contrary to the jury’s finding. Plas-Tex., Inc. v. U.S. Steel Corp., 772
S.W.2d 442, 445 (Tex. 1989).
 
Usury
          The Jury Questions
          The issues of usury liability and damages were set forth in jury questions 50
and 51 as follows:
QUESTION NO. 50
Do you find by clear and convincing evidence that any of the
following elements constitute a charge of interest to [AMPS] on
September 20, 1996, for the $2 million loan? 
 
a) the patent assignmentYES
b) the 30% optionYES
c) the 50% optionYES
 
“Interest” is the compensation allowed by law for the use or
forbearance or detention of money. 

QUESTION NO. 51What do you find to be the value of the items found by you to
constitute interest in response to Question No. 50?
 
Answer in dollars and cents, if any, as to each of the following.
 
a) the patent assignment$ 26.4mm 
b) the 30% option$ 330,000
c) the 50% option$ 550,000
          AMPS contends that, in addition to the prime rate of interest as consideration
for making a $2 million loan, LDE contracted for the patent assignment, the 30%
option, and the 50% option—which the jury found to equal over $26 million in
usurious interest. The jury found that the patent rights and stock options were
compensation for the use of money. The trial court rendered judgment against LDE
and LDNGH for usury, holding that AMPS (based on Sverdlin’s derivative claims)
was entitled to recover against LDE and LDNGH (by virtue of piercing the corporate
veil) for about $74 million. 
          The Law
          A usurious transaction is composed of three elements: (1) a loan of money; (2)
an absolute obligation to repay the principal; and (3) the exaction of a greater
compensation than allowed by law for the use of the money by the borrower. First
Bank v. Tony’s Tortilla Factory, Inc., 877 S.W.2d 285, 287 (Tex. 1994). “Interest”
means compensation for the use, forbearance, or detention of money. Tex. Fin. Code
Ann. § 301.002(a)(4) (Vernon Supp. 2003). “Usurious interest” is interest that
exceeds the applicable maximum amount allowed by law. Tex. Fin. Code Ann. §
301.002(a)(17) (Vernon Supp. 2003). Usury statutes are penal in nature and should
be strictly construed. Tony’s Tortilla, 877 S.W.2d at 287. 
          Whether an amount of money is interest depends not on what the parties call
it but on the substance of the transaction. First USA Mgmt., Inc. v. Esmond, 960
S.W.2d 625, 627 (Tex. 1997). Not every obligation on a borrower in connection with
a loan is interest. Id. For example, fees which are an additional charge supported by
a distinctly separate and additional consideration, other than the simple lending of
money, are not interest and thus do not violate the usury laws. Id.


 Courts will look
beyond the form of the transaction to its substance in determining the existence or
non-existence of usury. Gonzales County Sav. & Loan Ass’n. v. Freeman, 534
S.W.2d 903, 906 (Tex. 1976). A court will not hold a contract in violation of usury
laws unless, upon reasonable interpretation of all terms, it is clear the intention of the
parties was to charge more interest than allowed by the law. Smart v. Tower Land &
Inv. Co., 597 S.W.2d 333, 341 (Tex. 1980). 
          A fact question is raised when there is any dispute in the evidence as to
whether a charge in addition to interest is actually for an additional consideration. 
Texas Commerce Bank-Arlington v. Goldring, 665 S.W.2d 103, 104 (Tex. 1984).
When there are no disputed facts, however, courts have determined as a matter of law
whether a charge is additional interest for the lending of money or for separate,
additional consideration. Id. (holding that attorneys’ service, consideration in
addition to lending money, was not interest); Tony’s Tortilla, 877 S.W.2d at 287-88
(holding as a matter of law that bank’s fees were not interest). 
          The Facts
          LDE loaned AMPS $2 million for 5 years, with interest accruing at an annual
rate equal to the stated prime rate. Initially, Sverdlin pledged 30% of the AMPS stock
to secure the loan. LDE acquired an option to purchase 30% of AMPS stock from
Sverdlin, Swank, and McCoy pro rata. LDE acquired an option to purchase an
additional 50% in AMPS. 
          Additionally, Sverdlin assigned his patents to LDE, which simultaneously
licensed them to AMPS on a royalty-free basis. The investors initially wanted the
patents assigned to AMPS to protect their loan to AMPS. Sverdlin voiced concern
about a direct assignment to AMPS because a creditor of AMPS retained a prior first
lien on AMPS’s property. Sverdlin wanted to avoid any prospect of a lender asserting
a lien on his patents. Accordingly, the patents were assigned to LDE with heavy
encumbrances to protect Sverdlin’s rights. For example, LDE could not use the
patents. The Patent Assignment states, “Assignee [LDE] shall not use the Patent
Rights itself or license or assign the Patents or any interest therein to anyone other
than AMPS.” The Patent Assignment also states that if AMPS ceases operation using
the technology covered by the patents, then assignee (AMPS) shall reassign such
patent rights to assignor (Sverdlin). 
 
          •        LDE ➔ loaned $2 million to ➔ AMPS;
          •        LDE  received assignment of patent from  Sverdlin; and
          •        LDE ➔ gave royalty-free license of patent to ➔ AMPS.
          AMPS’s Theory to Support Usury
          AMPS argues that LDE and LDNGH “required—as compensation for a $2
million loan to AMPS—that Sverdlin assign his FCIS patents to LDE, that Sverdlin
grant LDE two options that would allow LDE to purchase 80% of AMPS’s stock, and
that AMPS pay interest on the loan at the prime rate.” According to AMPS, LDE
contracted for an assignment of the patents from Sverdlin with an immediate,
exclusive, and royalty-free license to AMPS, thereby charging AMPS the value of the
patents as interest, which resulted in usury. 
          Legal and Factual Sufficiency for Usury
          Appellants LDNGH and LDE contend that the evidence is legally or factually
insufficient to support the jury’s findings regarding the value of the patent
assignment. 
          $26.4 million reduced to $25.4 million
          As noted above, the jury valued the patent assignment at $26.4 million;
however, Sverdlin subsequently agreed to reduce this amount to $25.4 million. There
is no evidence in the record to support the verdict of $26.4 million because Sverdlin’s
expert testified that the value of the patent assignment was $25.4 million. Therefore,
Sverdlin’s motion for judgment reduced the value to $25.4 million. Sverdlin’s
counsel stated, “The testimony from the witness stand on behalf of the experts, both
of them, was that the patents independently had a value of 25.4 million dollars. And
that number is reflected in our motion for judgment. We have reduced the jury
verdict to that to conform it to the specific evidence that came on as to the value of
the patents.” Accordingly, we examine whether the evidence was sufficient to
support the $25.4 million valuation of the patent assignment.
          Valuation of the Patent
          Sverdlin presented two expert witnesses, Robert Hancock and Saul Solomon,
both licensed CPA’s. Hancock testified about the value of the patent and Solomon
testified about the value of the patent assignment. 
          Hancock determined that the value of the patent was $25.4 million. He used
a complicated financial process that was based on Swank’s financial predictions.


 
Specifically, Hancock used the June Letter Agreement written by Swank, which
contained a five-year projected income statement for 1996 through 2000. Hancock
explained, “I looked at the five-year projections and ascertained that they
were—AMPS was expected to earn a significant amount of money gradually building
up over the five-year period to about $27 million per year.” Swank’s projected net
income after taxes for these five years are as follows:


 

1996

1997

1998

1999

2000



Net income
after taxes

($351,427)

627,237

4,003,866

10,115,776

27,716,202



          Hancock assumed that in 2000, the projected net income would level off and
would continue at a zero growth rate for the next five years.


 He explained that
“when we got to the year five, I presumed that they would level off at the level of
sales and, thus, net income that they had achieved in year five and it would go out
into perpetuity, forever.” This assumption results in the following net incomes after
taxes:



 

2001

2002

2003

2004

2005



Net income
after taxes

$27,716,202

27,716,202

27,716,202

27,716,202

27,716,202




          Taking inflation into account, Hancock used a projected interest rate to
discount each of the ten cash flows back to their present value, or their value in 1996
dollars. He added those ten present values and reached a net present value of
$26,900,000, which he said represented the present value of AMPS’s net income cash
flows for ten years. Based on these calculations, Hancock opined that the value of
AMPS’s business in 1996 was $26,900,000. 
          However, the $26,900,000 amount included the value of the patents and
AMPS’s $1.5 million “topside repair business” that generated income from service
and repairs. Therefore, Hancock subtracted $1.5 million to reach his final
determination of $25,400,000 as the value of the patents.
             26,900,000          (Total present value of AMPS)
          - 1,500,000         (Value of top side repair business)
          = 25,400,000         (Value of patent)
          Valuation of the Patent Assignment
          Solomon testified that the value of the patent assignment was equal to the value
of the patent. During cross-examination, AMPS’s counsel questioned Solomon about
the heavy encumbrances on the patent assignment. For example, LDE could not use
the patent rights itself, nor could it license or assign the patents to anyone other than
AMPS. Additionally, if AMPS ceased operation using the technology covered by the
patents, then LDE was required to reassign the patent rights to Sverdlin. 
          Solomon opined that, despite such encumbrances, LDE received the full value
of the patents because LDE was a controlling shareholder in AMPS. Solomon
testified as follows: 
[AMPS’s
counsel]: It says [referring to Patent Assignment], “Assignee shall
not use the patent rights itself or license or assign the
patents or any interest therein to anyone other than
AMPS.” . . . . Given that language, what value does LDE
have as a result of assigning patents when they can’t use it
themselves, they can’t license anybody but AMPS?
 
Solomon: Well, the value that they have is attributed to them through
their control of AMPS. The fact that they control both the
assignor and the assignment made between LDE
Associates and AMPS which is the second part of this
transaction. They control both – LDE Associates control
both the licensing and the use of those patents. To give
you an example, AMPS has the ability to license these
patents to other companies. As long as AMPS is receiving
a license fee of some amount, they have the ability to do
that. AMPS could turn around and license these patents to
another affiliate of Louis Dreyfus, any one of the
companies, or anybody they so choose to and both sides of
that transaction are controlled by the same people, the LDE
Associates, Louis Dreyfus Natural Gas Corporation. 
 
[AMPS’s
counsel]: Well, that hasn’t happened, has it?
 
Solomon: [N]ot to my knowledge have they licensed the patents to a
third party or to another Louis Dreyfus company. 
 
[AMPS’s
counsel]: In fact, they licensed the patents back to AMPS, didn’t
they? 
 
Solomon: Well, they did; but that did not preclude them from
licensing it to another person. They controlled both
sides—
 
[AMPS’s
counsel]: LDE can’t license the patent to anyone else?
 
Solomon: No, LDE cannot but AMPS can—. . . .
 
[AMPS’s
counsel]: And AMPS could license to someone else and receive the
money? . . . . And who owns AMPS?
 
Solomon: AMPS is owned primarily by LDE—I’m sorry, AMPS is
owned—right now the contention, as a part of this lawsuit,
is the stock is still in the name of Mr. Sverdlin.
 
[AMPS’s
counsel]: At the time this loan agreement was signed in September
of ‘96, who owned the stocks in AMPS?
 
Solomon: Mr. Sverdlin owned the stock at that time.



 
[AMPS’s
counsel]: 100 percent, correct?
 
Solomon: That’s correct.
 
[AMPS’s
counsel]: So, who received the value if AMPS at that time were to
license the patents?
 
Solomon: You’re missing the point. AMPS could license those
patents for a dollar to another Louis Dreyfus control
company who would receive all the benefits, all of the
economic benefits of those patent rights or they could
assign it back – they can’t assign it back to LDE according
to the document. But there are other markets and other
applications that they could also license to other third
parties and receive the benefits of that. 
 
[AMPS’s
counsel]: But that hadn’t happened at that time, had it? 
 
          Solomon:     It had not happened at that time.
 
[AMPS’s
counsel]: Hadn’t happened to date? 
 
          Solomon:     Not that I’m aware of.
 
[AMPS’s
counsel]: But your testimony is that LDE got $25,400,000 of value
at the time this loan agreement was closed?
 
Solomon: As the value of the patent rights that were assigned to them
in this transaction, yes. 
          Solomon thus posited that the patents assignment had value to LDE “through
their control of AMPS.” Solomon explained that, although LDE could not sell the
patents, LDE did control AMPS, and AMPS could “turn around and license these
patents to another affiliate of Louis Dreyfus, any one of the companies, or anybody
they so choose.” Therefore, AMPS asserts, LDE received the full value of the patents
because LDE was a controlling shareholder in AMPS.
          We reject this view. If LDE requests this Court to disregard the corporate
structure on the patent assignment, then we would also have to disregard the
corporate structure as to the loan itself. In other words, if LDE fully controls AMPS
with regard to the restrictions on the patent assignment, then LDE could disregard its
$2 million loan to AMPS, and instead consider the $2 million as a capital investment. 
AMPS cannot have it both ways. 
          A usurious transaction is tested not by what the debtor parts with, but rather by
what the creditor receives. Stewart v. Briggs, 190 S.W. 221, 222 (Tex. Civ.
App.—Texarkana 1916, no writ). The value of the patent assignment is based on the
value received by LDE, including the encumbrances. LDE did not have the right to
sell or even use such patents pursuant to the assignment; therefore, LDE did not
benefit from the full value placed on the patents. 
          We hold that the value of the patents does not equate to the value of the patent
assignment. Because the jury had no evidentiary basis on which to base its valuation
of the patent assignment, we must disregard the finding. The value of the patent
assignment is crucial to Sverdlin’s usury claim. The $2 million loan, even with the
prime interest rate and the values the jury found for the stock options, cannot be
considered usurious without considering the patent assignment. 
          We reverse the judgment of the trial court with regard to usury and render
judgment that AMPS take nothing on its usury claim.
          Because AMPS cannot recover for usury, we do not reach the remaining
arguments by LDE and LDNGH, which included: transfer by a third party, savings
clause, contingency, uncertain or speculative value, and notice. We do not reach
LDNGH’s arguments that it cannot be liable for usury when it was not the lender and
did not charge for, contract for, or receive usurious interest; nor can it be liable for
usury under the veil-piercing theory. We also do not reach LDE’s arguments
challenging the legal and factual sufficiency of the evidence in support of the jury’s
actual damage award for usury and the application of the statutory cap to punitive
damages for usury. Nor do we reach Sverdlin’s cross-appeal challenging the trial
court’s calculation of the usury penalty. 
Breach of Fiduciary Duty
          The Jury Questions
          The issues of breach of fiduciary duty and resulting damages were set forth in
jury questions 16 and 17 as follows:
QUESTION NO. 16
Did any of the following individuals breach a fiduciary duty to [AMPS]?
 
Answer “yes” or “no” as to each of the following
 
                                                             YES             NO
                    a) Mark Swank                 •
b) Jim McCoy •
c) Jeffrey Sussman •
d) Marvin Chudnoff •
 
You are instructed that an officer or director of a corporation owes a
fiduciary duty to the corporation and the shareholders collectively. You
are instructed that the fiduciary duty that is owed by an officer or
director of a corporation includes the duty of loyalty, the duty of
obedience, and the duty of due care.
 
Where a fiduciary relationship exists, the burden is on the fiduciary to
show that he acted fairly and informed the beneficiary of all material
facts relating to the challenged transaction.

QUESTION NO. 17
 
What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate [AMPS] for its damages, if any, that were
proximately caused by such breach of fiduciary duty?
 
Answer in dollars and cents, if any.
 
                    a) Mark Swank                $5 mm
b) Jim McCoy$5 mm
c) Jeffrey Sussman$5 mm
d) Marvin Chudnoff$5 mm
          AMPS’s Theory to Support Breach of Fiduciary Duty
          AMPS contends that Swank breached his fiduciary duty because he was an
integral part of the “scheme to steal the FCIS technology, seize control of AMPS, run
it at a loss, and profit at the company’s expense.” It argues that Chudnoff and
Sussman breached their fiduciary duties because they “defrauded their way onto
AMPS’s Board, seized control of the company, created incentives to profit personally
as the company’s value fell, and proceeded to run it at a loss. As directors of AMPS,
part owners of LDE, and individual owners of the 50% option, their interests were
consistently in conflict.” 
          Damages for Breach of Fiduciary Duty
          The trial court disregarded the jury’s answers with regard to McCoy and
assessed damages against Swank, Sussman, and Chudnoff. First, we will address
McCoy, then we will turn to the sufficiency of the evidence to support the damage
award for the alleged breaches by Swank, Sussman, and Chudnoff. 
          McCoy
          In a cross-point, AMPS contends that the trial court erred in disregarding the
jury’s finding that McCoy breached his fiduciary duty to AMPS. Specifically, AMPS
appealed the court’s disregard of the jury’s finding to the liability question regarding
breach of fiduciary duty by McCoy, as set forth above in Jury Question 16. AMPS
did not raise as error on appeal the court’s disregard of the damages question, Jury
Question 17, which awarded AMPS $5 million for McCoy’s breach of fiduciary duty. 
AMPS’s brief on appeal does not challenge this damage question.


 Accordingly,
AMPS waived any error as to McCoy. Tex. R. App. P. 38.1. 
          Swank, Sussman, and Chudnoff
          The judgment awarded AMPS damages for breach of fiduciary duty in the
amount of $5 million each against Swank, Sussman, and Chudnoff, for a total of $15
million. Swank, Sussman, and Chudnoff contend that the evidence is insufficient to
support the damage award. 
          AMPS responds that the $20 million total award (this figure includes the jury’s
$5 million award against McCoy, which was later set aside) was less than what the
evidence established as the maximum amount of damages available for this injury. 
Specifically, AMPS explains that the jury could have found that AMPS was originally
worth $26.9 million and lost everything. The $26.9 million value was derived from
Hancock’s testimony that AMPS was worth $26.9 million in June 1996, based in part
on projections. AMPS adds the $26.9 million damage model to AMPS’s $3.1 million
in losses between January 1997 and July 1998, to reach a total of $30 million. AMPS
then divided the $30 million by the six defendants found to have harmed AMPS by
breaching fiduciary duties. In other words, AMPS argues that the jury could have
apportioned the total $30 million loss among the six defendants, for a total of $5
million each. 
             $26,900,000        (Hancock’s valuation of AMPS)
          + 3,100,000       (losses between January 1997 & July 1998)
          = 30,000,000       (AMPS’s total loss)
 
             $30,000,000        (AMPS’s total loss)
          / 6       (number of defendants)
          = 5,000,000       (jury award)

          It is important to note that AMPS bases its calculation on the following six
defendants: (1) Swank; (2) McCoy; (3) Sussman; (4) Chudnoff; (5) Gardere Wynne;
and (6) David Jungman. Swank, McCoy, Sussman, and Chudnoff were listed in the
jury question for breach of fiduciary duty damages. Gardere Wynne and Jungman
were not. Sverdlin had sued Gardere Wynne and Jungman for malpractice. The jury
awarded Sverdlin nearly $60 million in actual and exemplary damages on those
claims, which were later settled for a confidential amount. 
          During the December 29, 1998 hearing on entry of judgment, AMPS’s counsel,
Mr. Cunningham, explained the calculations as follows: 
Now, the best I can do — and these lawyers are representing these
individual parties will be much more articulate than I am in trying to say
what their objections are to the total of $20 million to be awarded to
AMPS derivatively; but the substance of what they are saying is they
can’t figure out how they come up with $5 million; but I can figure it out
judge. 
 
And that is that this corporation , the evidence is clear, was worth
at least $27 million. . . . the expert’s testimony was $26.9 million. . . . 

Now, what they say is well between $20 million and of course
before the settlement with Gardere & Wynne, 10 million more, that will
be $30 million. That will be more than 27 point — $26.9 million. 
 
. . . [T]here is a million six that was lost in 1997 plus another
million dollars through six months of 1998; and if they are losing five
hundred thousand dollars a month and you give another five hundred
thousand dollars which just coincidentally the receiver’s papers that he
just filed for the third quarter reflect almost exactly that, a loss of a
million four hundred and ninety, ninety-three or ninety-four some odd
thousand dollars for the year, if you take that million five and add it to
a million six and add it to 26.9, if you add one point six that they lost in
1997, plus a million five through three quarters of 1998 when this jury
was hearing this evidence, you get to three million one. If you add three
million one to 26.9, guess what you get, $30 million dollars. Twenty
plus the ten caused by Gardere & Wynne.
 
. . . [T]hey are going to say, “Well, wait a minute. How did they
get to $5 million?”
 
Well, if you take 30, if you know that’s what the company lost;
and we know that because that was the minimum loss based on the
testimony. . . . its clear to me that the jury just said we know they have
lost at least $30 million. If we divide it by 6, that’s the most rational
way to do it.



          AMPS divided the $30 million losses by six defendants. This calculation is
flawed because the jury assessed a total of $20 million in damages against four
defendants. Specifically, in Question Number 17, the jury assessed $5 million each
in breach of fiduciary duty damages against the following four defendants: Swank,
McCoy, Sussman, and Chudnoff. The jury did not assess a damage award for breach
of fiduciary against Gardere Wynne, Jungman, LDE, or LDNGH. In Question
Number 21, the jury assessed $10 million, or $5 million each to Gardere Wynne and
Jungman for negligence—not for breach of fiduciary duty. Nowhere in the charge
did the jury assess an additional $10 million for breach of fiduciary duty to Gardere
Wynne and Jungman. As set forth above during the hearing, Mr. Cunningham stated,
“$20 million and of course before the settlement with Gardere & Wynne, 10 million
more, that will be $30 million.” We cannot consider the settlement amount and find
no evidence of “$10 million more” by Gardere Wynne. Thus, we hold that there is
no evidence in the record to support AMPS’s calculation. 
          We recognize that the jury has discretion to award damages within the range
of evidence presented at trial, so long as a rational basis exists for the jury’s
calculation. Mayberry v. Texas Dept. of Agric., 948 S.W.2d 312, 317 (Tex.
App.—Austin 1997, writ denied). Through Hancock, AMPS presented a specific
damage model and posited a precise (albeit flawed) calculation based on $30 million
divided by 6 defendants to reach $5 million each. Therefore, this case is
distinguishable from other types of cases in which the jury was presented with a range
of potentially appropriate awards. See id. 
          Instead, this case is more akin to First State Bank v. Keilman, in which both
parties provided a “relatively precise method” for calculating unauthorized interest. 
851 S.W.2d 914, 931 (Tex. App.—Austin 1993, writ denied). In Keilman, the jury’s
$360 award fell in between the plaintiff’s $7,161.44 figure and the defendant’s $0
figure. Id. Although the award was within the range, the court explained that “a jury
may not ‘pull figures out of a hat’; a rational basis for the jury’s calculation must
exist.” Id. at 930 (quoting Neiman-Marcus Group, Inc. v. Dworkin, 919 F.2d 368,
372 (5th Cir. 1990)). The court concluded that the jury’s finding of $360 was
inexplicable in light of the evidence presented at trial and that there was no rational
basis for the calculation. Id. at 931. A jury may not “arbitrarily assess an amount
neither authorized nor supported by the evidence presented at trial.” Id. at 930. 
Because it appeared that the jury pulled its award “out of a hat,” the court held that
the evidence was insufficient. Id. at 931. 
          After a thorough review of the record, we conclude that there is no evidence
in the record to support a finding that each of these defendants specifically caused $5
million in damages for their alleged breaches of fiduciary duty. We therefore hold
that the evidence is legally insufficient to support the jury’s $5 million awards each
against Swank, Sussman, and Chudnoff for breach of fiduciary duty. 
          We reverse the judgment of the trial court with regard to the damage awards
for breach of fiduciary duty. Because there is no evidence to support the damage
awards for breach of fiduciary duty, we likewise reverse the judgment with regard to
exemplary damages for breach of fiduciary duty and conspiracy to breach fiduciary
duty. We render judgment that AMPS take nothing on its breach of fiduciary duty
claims. 
Tortious Interference
          Appellants contend that the evidence is legally and factually insufficient to
support the jury’s finding that they tortiously interfered with Sverdlin’s employment
agreement with AMPS. 
          The Jury Question
          The issue of tortious interference was set forth in jury question 42 as follows:
QUESTION NO. 42
Did any of the following individuals or entities intentionally
interfere with Anatoly Sverdlin’s Employment Agreement with [AMPS]
without legal justification?
 
Answer “yes” or “no” as to each of the following.
 
YESNO
a) Mark Swank •
b) Jim McCoy •
c) Marvin Chudnoff •
d) Jeffrey Sussman •
e) LDNGH •
f) LDE •
You are instructed that interference is intentional if committed
with the desire to interfere with the contract or with the belief that
interference is substantially certain to result.
 
You are further instructed that legal justification means a good
faith belief that he/she/it had a right to interfere with the contract.
          The Law
          A party to a contract has a cause of action for tortious interference against any
third person who wrongly induces another contracting party to breach the contract. 
Holloway v. Skinner, 898 S.W.2d 793, 794-95 (Tex. 1995). The elements of tortious
interference with a contract are: (1) the existence of a contract subject to interference;
(2) willful and intentional interference; (3) interference that proximately caused
damage; and (4) actual damage or loss. Powell Indus., Inc. v. Allen, 985 S.W.2d 455,
456 (Tex. 1998).
          In most cases, the alleged tortfeasor is a stranger to the contract. Holloway,
898 S.W.2d at 795. However, the inducing and the breaching party may be one and
the same. Id. When the alleged tortfeasor is also a corporate agent, the second
element of this cause of action, the act of interference, is of particular importance. 
To establish a prima facie case under such circumstances, the alleged act of
interference must be performed in furtherance of the tortfeasor’s own personal
interests. Id. at 796. This requirement is necessary to preserve the general rule that
a party cannot tortiously interfere with its own contract. Id. To meet this burden in
a case of this nature, the plaintiff must show that the tortfeasor acted in a fashion so
contrary to the corporation’s best interests that his actions could have been motivated
only by personal interests. Id. (emphasis added). A corporate agent’s “mixed
motives” to benefit himself as well as the corporation are insufficient to establish
liability. Id. at 796 (citation omitted). When determining whether an agent acted
against the corporation’s interests, we consider the corporation’s evaluation of the
agent’s actions. Powell Indus., Inc., 985 S.W.2d at 457. “A corporation is a better
judge of its own best interests than a jury or court.” Id. 
          Waiver
          Sverdlin contends that appellants waived this challenge by failing to object to
the form of the question submitted. We disagree. An objection to the charge was not
necessary here because we are reviewing the sufficiency of the evidence to support
the finding based on the definition and instructions submitted to the jury in the charge
as written. See Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568 (Tex. 1985). 
          No Evidence of Tortious Interference
          Appellants contend that Powell Indus., Inc. v. Allen is directly on point. 985
S.W.2d at 457. In Powell, the company’s CEO asked Allen, another executive, to
have the company pay $3,000 for the CEO’s personal accounting services. Id. at 456. 
Allen told the CEO that payment would be illegal. Id. Shortly thereafter, Allen was
fired, and he sued the CEO for tortious interference with his employment contract. 
Id. The court held, “While [the CEO] may have benefitted by firing Allen, the mere
existence of a personal stake in the outcome is insufficient to show that the defendant
committed an act of willful or intentional interference.” Id. at 457. Allen did not
adduce evidence that the CEO acted “only in his own interest and against the
company’s interest”; therefore, the tortious interference claim failed. 
          Similarly, in this case, it is insufficient for Sverdlin to show that appellants
committed an act of willful or intentional interference. There were reports that
Sverdlin had become disruptive, abusive, and a negative force in the company. As
in Powell, evidence of a corporate officer’s mixed motives—to benefit both himself
and the corporation—is insufficient to prove tortious interference. Id. Sverdlin did
not adduce evidence that appellants acted only in their own interests and against
AMPS’s interests. The record shows that AMPS’s board authorized Swank to fire
Sverdlin. Given the board’s approval of firing Sverdlin, and Swank’s action in firing
Sverdlin based on such approval, we cannot conclude that Swank, Chudnoff,
Sussman, or McCoy acted in a manner so contrary to AMPS’s interests that they
could have been motivated only by their personal interests. Sverdlin argues that his
termination was not in AMPS’s best interests; however, even if true, this complaint
is not conclusive evidence of tortious interference. See id. (“A principal’s complaint
about its agent’s actions is not conclusive of whether the agent acted against the
principal’s best interests.”) 
          Moreover, even after Sverdlin was fired, he did not have the authority to fire
the board members, despite his threats to do so. Under the loan agreement, Sverdlin
had agreed to vote all shares of AMPS to elect at least two individuals designated by
the lender. Accordingly, appellants’ job security could not have been a motivation
to fire Sverdlin. Because appellants’ stock options in AMPS were already granted to
them, those rights would not have changed by firing Sverdlin. Finally, appellants had
a financial interest in AMPS, including stock, stock options, and loans. Thus, they
had financial reasons to act in the best interest of AMPS. 
          LDE Associates was represented by agents Sussman and Chudnoff who were
on the board at AMPS and acted in a manner consistent with AMPS’s interests and,
therefore, cannot be liable for tortious interference. Likewise, LDNGH cannot be
liable for tortious interference based on such agent’s or LDE Associate’s liability. 
          After reviewing the record in this case, we hold that there is no evidence to
prove that appellants committed an act that was so contrary to the corporation’s best
interests that it could have been motivated only by the pursuit of personal interests. 
Therefore, we hold that there is no evidence of tortious interference. We reverse the
judgment with regard to tortious interference and render judgment that Sverdlin take
nothing on his tortious interference claim. 
          Accordingly, we need not address the affirmative defense of legal justification. 
Nor do we reach appellants’ remaining argument that the punitive damages for
tortious interference are in excess of the statutory limit. 
Fraud Damages
          We address whether there is evidence of damages for fraud against Sverdlin in
connection with the transaction involving his patents. 
          The Jury Question
          The issue of fraud damages was set forth in jury question 35 as follows:
QUESTION NO. 35What sum of money, if any, if paid now in cash would fairly and
reasonably compensate Anatoly Sverdlin for his damages, if any, that
were proximately caused by such fraud?
 
Answer in dollars and cents, if any, as to each of the following.
 
          a) Mark Swank               $26.5mm
          b) Jim McCoy                 $26.5mm
          c) Marvin Chudnoff        $26.5mm
          d) [LDNGH]                   $26.5mm
          e) [LDE]                         $26.5mm
 
Consider the following element of damages, if any, and none other: 
 
The difference, if any, between the value of the patents as received and
the value they would have had if they had been as represented. 

(Emphasis added.) 
 
          Waiver
          Sverdlin contends that appellants waived this challenge by failing to object to
the form of the question submitted. Again, we disagree. An objection to the charge
was not necessary here because we are reviewing the sufficiency of the evidence to
support the finding based on the definition and instructions submitted to the jury in
the charge as written. See Larson, 690 S.W.2d at 568. We are not authorized to
evaluate the sufficiency of the evidence under calculations different from those the
jury were instructed to employ. See id.
          No Evidence of Fraud Damages
          There is no evidence to support an award of damages for fraud based on the
measure of damages submitted to the jury. Sverdlin’s fraud claim was not based on
misrepresentations regarding the patents, and the patents were to be conveyed by
Sverdlin, not received by him. Sverdlin did not purchase the patents, and the value
of the patents was never misrepresented to him. Thus, there is no evidence of the
value of the patents as received, the value of the patents as represented, or the
difference, if any, between those values. The only evidence of the value of the
patents was the value of the FCIS business, $25.4 million, which Hancock, Sverdlin’s
and AMPS’s expert on damages, also identified as the value of the patents. There is
no evidence to support a damage award for fraud under the theory submitted to the
jury. 
          We reverse the judgment of the trial court for fraud damages in connection with
Sverdlin’s patents and render that Sverdlin take nothing on his fraud claim. 
Therefore, we do not reach the issue of fraud liability. 
Negligent Misrepresentation
          Sverdlin asserts a conditional cross-appeal asserting that the trial court erred
in disregarding the jury’s affirmative finding of negligent misrepresentation. 
          To prevail on a negligent misrepresentation claim, the plaintiff must
demonstrate: (1) the representation was made by a defendant in the course of his
business, or in a transaction in which he had a pecuniary interest; (2) the defendant
supplied false information for the guidance of others in their business; (3) the
defendant did not exercise reasonable care or competence in obtaining or
communicating the information; and (4) the plaintiff suffered pecuniary loss by
justifiably relying on the representation. Federal Land Bank Ass’n. v. Sloane, 825
S.W.2d 439, 442 (Tex. 1991). To establish negligent misrepresentation, the plaintiff
must also prove that the defendant misrepresented an “existing” fact in the course of
the defendant’s business rather than a promise of future conduct. See Miksch v.
Exxon Corp., 979 S.W.2d 700, 706 (Tex. App.—Houston [14th Dist.] 1998, pet.
denied). 
          The alleged oral representations, which Sverdlin asserts constitute negligent
misrepresentation, are promises of future conduct, and are not promises of existing
fact. See id. (holding that alleged oral promise not to terminate Miksch was not a
misrepresentation of an existing fact but was a promise to refrain from taking an
action in the future). For example, the alleged oral promises not to fire Sverdlin, not
to take control of AMPS, and not to exercise their stock options are promises of
future conduct, not existing fact. As such, Sverdlin is not entitled to recover for
negligent misrepresentation. 
          In determining whether Sverdlin met the justifiable reliance element, we must
consider the nature of the relationship and the contract. Reliance on representations
made in a business or commercial transaction is not justified when the representation
takes place in an adversarial context. McCamish, Martin, Brown & Loeffler v. F.E.
Appling Interests, 991 S.W.2d 787, 794 (Tex. 1999). Chudnoff, LDNGH, and LDE
were adversaries of appellees in negotiating the June and September 1996 contracts. 
Thus, representations made by Chudnoff, LDNGH, and LDE during the contract
negotiations do not justify reliance by Sverdlin and AMPS. Furthermore, in
examining the contracts, the alleged misrepresentations by appellants are contrary to
the terms of the contracts. To determine the terms of the contract, Sverdlin could
have read the contracts. The fact that Sverdlin failed to read the contracts and simply
chose to sign them does not amount to a ground of recovery for negligent
misrepresentation. 
          We hold that the trial court did not err in disregarding the jury’s finding of
negligent misrepresentation. 
Remaining Issues
          The parties have also raised issues about disregarding the corporate fiction,
reliability of expert testimony, multiple recovery, punitive damages (statutory cap and
constitutionality), remittitur, settlement credit, attorneys’ fees, perjury, and jury
argument. Based on our disposition of the issues set forth above, we need not address
the remaining issues and decline to do so. 
Conclusion
          For the above reasons, we reverse the judgment of the trial court and render
judgment that Sverdlin and AMPS take nothing. 


                                                                        Adele Hedges
                                                                        Justice

Panel consists of Justices Hedges, Jennings, and Evans.