TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00408-CV






George Dix and Dahlia Gutierrez, Appellants


v.


Jon H. Brooks, d/b/a Brooks Custom Homes, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. GN300703, HONORABLE DARLENE BYNRE, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 This appeal arises from a dispute between a custom home builder, appellee Jon H.
Brooks, and a married couple, appellants George Dix and Dahlia Gutierrez. Appellants contracted
to purchase a lot from Brooks and have Brooks construct a new home there; they also had Brooks
perform remodeling and repair work to prepare their existing home for sale. Disagreements arose
concerning both sets of transactions, appellants terminated the new home construction contract, and
the parties sued each other for damages. A jury found in favor of Brooks on each of his claims,
against appellants on each of their claims and affirmative defenses, and awarded Brooks actual
damages of $42,000 relating to the new home construction plus $6,500 for his work on the existing
home. The district court rendered judgment on this verdict, also awarding $50,000 in stipulated
attorney's fees through trial and a total of $15,000 in appellate attorney's fees.

 Appellants challenge the portions of the judgment relating to the new home
construction and the appellate attorney's fees award. We will affirm.


BACKGROUND


The construction contract and loan agreement

 In 2001, while shopping for a new home, appellants became interested in purchasing
a lot at 9221 Simmons Road in Austin and building a new home there. Appellants ascertained that
Brooks owned the lot and contacted him. This led to discussions concerning appellants purchasing
the lot and having Brooks build a new home there. Appellants paid Brooks to draw up plans for the
new home, meeting with Brooks several times during that process at their existing home at 7500
Stepdown Cove. Eventually, on January 26, 2002, the parties executed a "Residential Construction
Contract," whose key provisions included the following: 



 Brooks agreed to build a new home on the lot on 9221 Simmons Road in
accordance with the Plans and Specifications prepared by Brooks.

 Appellants promised to pay Brooks a total of $525,823 ($125,000 for the lot and
$400,823 for construction and related improvements), subject to agreed
adjustments for change orders and other modifications as construction
progressed.

 Brooks was permitted to obtain Progress Payments by making "draw requests for
payment by Owner based upon the allocated cost of the completed portions
and/or phases of construction performed to the date of each request."

 Upon presentation of a request for a Progress Payment, appellants had five
business days to pay 90 percent of the amount allocated to the completed portion. 
However, if Brooks's work on a portion did not comply with the Plans and
Specifications, appellants had the right to so notify Brooks and withhold all or a
portion of a Progress Payment as necessary to cover the cost of correcting such
defect and until such correction was made. 

 Appellants would obtain, prior to commencement of construction, an Interim
Construction Loan to finance the project. The Progress Payments could be
satisfied either wholly or partly through draws on the Interim Loan.




 Appellants eventually obtained the Interim Loan from National City Mortgage
Company (NCM). On April 5, 2002, NCM, appellants, and Brooks executed a Residential
Construction Loan Agreement whereby NCM would loan a total of $509,750 to appellants ($400,823
for construction, the rest to go toward the lot). The Loan Agreement required NCM to advance loan
proceeds "periodically, as construction of the Residence progresses, in the amounts and for the work
described in the Construction Draw Schedule." The draw schedule listed various stages of
construction and assigned to each stage percentages of the loan that Brooks could draw when he
completed that stage.

 To obtain an advance, the loan agreement required that "[a]t least five (5) business
days prior to the date on which each advance is to be made, the Requisition and all other documents,
instruments, and writing which may be required by Lender shall be delivered to Lender." Other
documentation, however, indicated that NCM would fund draws ten days after the request was
submitted; in the interim, NCM would send an inspector to verify that the claimed stage of
construction had been completed.

 On the same day they executed the Loan Agreement, the parties also executed an
"Addendum to Residential Construction Loan Agreement" that provided, in relevant part:


2. Inasmuch as Borrower has selected Contractor to construct the Residence based
upon Contractors's skill and reputation, Borrower has elected to forego
participation in the disbursement aspects of the Loan and Borrower has and does
hereby appoint Contractor as Borrower's duly authorized agent for purposes of
taking any and all actions (including, but not by way of limitation, submission
of either written or verbal draw requests) necessary on Borrower's behalf to
obtain disbursements or draws pursuant to the [Loan] Agreement. Borrower
represents unto Lender, its successors, assigns, agents and counsel that each and
all of them may rely on Contractor's authority to act in Borrower's stead as
aforesaid. . . . Notwithstanding the foregoing, Borrower and Contractor
understand and agree that Lender requires Borrower's signature, along with
Contractor, on each advance check disbursed under the Loan.


3. Contractor does hereby accept such appointment to act on behalf of Borrower
as Borrower's duly authorized agent and represents unto Lender, its successors,
assigns, agents and counsel that all actions taken in such regard shall be taken
within the scope of the agency hereby created and upon which authority Lender
may rely.



 In addition to these requirements, the loan agreement established certain conditions
precedent before NCM would issue the first and final draws. Before the first draw, both parties had
to execute the loan agreement, security instrument and "[a] written draw request or requisition (the
'Requisition') in a form acceptable to Lender"; "[i]f requested by Lender, each such Requisition shall
be accompanied by invoices, receipts, certificates and other documents," and a Disbursement
Authorization. Appellants executed the Disbursement Authorization at closing. It provided, in
relevant part, that "Lender shall advance all construction funds in accordance with this Disbursement
Authorization upon Lender's receipt of verbal or written draw requests from either Borrower and/or
Contractor" and that disbursements shall be in accordance with the Loan Agreement." It was
undisputed that the agreements themselves did not require Brooks to submit subsequent draw
requests other than the final one to appellants for prior approval.

Brooks is hired to work on appellants' existing home

 During their discussions concerning the new home construction, appellants had also
asked Brooks to perform some repair and remodeling work on their existing home to prepare it for
sale. Before Brooks began this work, however, a pipe burst, water flooded a portion of the house,
and eventually mold was discovered in that area. Appellants' insurer paid for mold
remediation--the stripping of sheetrock, cabinetry, insulation, and other internal features, down to
the studs, from floor level to four feet above--and agreed to pay to restore these portions of the
home. Brooks performed this restoration work. In addition to this work, appellants asked Brooks
to perform certain work for which they would pay him out-of-pocket. (1)


Disputes arise

 As Brooks performed work on appellants' existing home and began construction of
their new home, the parties' relationship deteriorated. Appellants questioned Brooks's workmanship
on both projects and contended that he and his subcontractors were rude and unresponsive. Brooks
disputed appellants' assertions about his workmanship (2) and sought to portray them as difficult
customers who frequently and unreasonably complained to him or his subcontractors (or threatened
them with legal action) and caused delays by changing their minds regarding the work they wanted
done. (3)

 It is undisputed that Brooks encountered delays both in getting appellants to pay his
invoice for work on their existing home and in obtaining their approval for the first draw. In early
August, Brooks had installed the plumbing "rough" running under and through the new home
foundation and poured the foundation. On August 7 or 8, as required by the construction contract,
Brooks submitted his first draw request to appellants for approval. Brooks requested a total of
$52,348, equaling 14% of the construction contract amount, representing the plumbing rough (2%)
and the foundation (12%). Appellants did not respond to this request within five days, as required
under the construction contract. Gutierrez eventually signed the draw request on August 31, and Dix
signed it on September 17. (4) NCM inspected the work to verify completion of the two stages and
paid the first draw to Brooks on October 1. Appellants assert that they delayed paying the invoices
and approving the first draw because they had concerns about Brooks's workmanship, while Brooks
attributed appellants' delays to the fact that the couple had "split up" at the time. (5)


The garnishment action

 On October 28, 2002, appellants were served with a garnishment issued by David and
Constance Yetter related to a lawsuit in which they had sued Brooks and other defendants over
foundation problems in a nearby house Brooks had built. Appellants testified that this event alarmed
them for several reasons. It revealed that another homeowner had sued Brooks for construction
defects. Appellants also determined that the Yetters had taken an $800,000 default judgment against
Brooks, raising doubts about his solvency and ability to complete work; they also determined that
Brooks's pleadings had been stricken for his failing to attend court-ordered mediation. Finally,
appellants claim that the existence of the Yetter litigation contradicted a representation that Brooks
had made several months earlier. Appellants assert that while seeking financing, one potential lender
rejected their loan application immediately after the lender learned that Brooks was to be their
builder. The lender refused to elaborate on its concerns, which led appellants to infer that Brooks
must have been in litigation involving the lender. Appellants contend that they then asked Brooks
whether he was involved in any litigation, and that Brooks denied that he was.

 Brooks denied that appellants ever inquired about or discussed with him impending
litigation before they were served with the garnishment. He attributed the default judgment to a prior
attorney who failed to keep him informed of events in that case. Brooks stresses that upon learning
that appellants had been served with the garnishment, he immediately sought to assist them in getting
the proceeding dismissed and agreed to pay their attorney's fees. (6) He also testified that he had
considered but rejected filing for bankruptcy because "my subs would have been put at risk" and
appellants "would have got right in the middle of that and they would have been encumbered. It
would not have been a noble thing for me to do."

 Ultimately, on December 10, Brooks agreed to settle the Yetter suit for $42,500; (7) his
agreement to pay appellants' attorney's fees and release and indemnify them was also incorporated
into the settlement agreement. Brooks ultimately paid appellants $2,700 with a cashier's check dated
December 18. On December 23, Brooks paid the Yetters with a cashier's check, and the Yetters'
suits were dismissed.


The second draw

 Dix testified that after appellants were served with the garnishment on October 28,
he ordered Brooks to stop work on the new home construction until further notice. Brooks denies
this; he and several of the subcontractors on the project testified that work continued through
November and December.

 On Friday, December 13, Brooks hand-delivered a copy of a second draw request to
appellants at their existing home on Stepdown Cove. This request, for $98,201.63, or 24.5% of the
construction loan amount, purportedly included framing of the walls (assigned 10% under the draw
schedule), roof framing and sheathing (4%), exterior wall sheathing (1%), cornice and soffit (2%) (8),
furnace ducts (4%) and wiring rough-in (2%). Additionally, Brooks requested 1.5% for partial work
on the windows, door, and garage; the draw schedule assigned 3% for the completed stage.

 Brooks left the second draw request in appellants' mail box. The front page of the
request was a fax cover sheet addressed to NCM. In the subject line, Brooks hand-wrote "2nd
DRAW Request," and in the space reserved for comments he wrote the following: 



I thought I'd get you the Draw Request to you so that you'll have it Monday. 
Everything is progressing next week with the [Settlement] Agreement and All is
Looking well. If you have any questions please call me at your Earliest Convenience.


All Bills are paid and I'm getting lien waivers signed.


 [signed] Jon H. Brooks 


Brooks faxed the request to NCM on the same day or the next day. It is undisputed that appellants
received this request on or about December 13 but did not object or otherwise contact Brooks or
NCM concerning it.

 Appellants assert that around the time Brooks settled the Yetter suit, Brooks broached
the possibility of submitting a second draw request, and that Dix had instructed him not to submit
the request until appellants sought advice from their attorney. Appellants claim they were outraged
when, a few days later, they found the draw request in their mailbox. 

 Brooks denied that appellants had instructed him not to submit the second draw
request. Brooks explained that he had left the copy in appellants' mailbox because he had come to
their house, saw the garage open with two cars inside, concluded that appellants were home, but that
no one had answered the front door. Brooks acknowledged that he faxed the request to NCM on the
same day or the next day; he explained that NCM would not release the funds until it had inspected
the work, so he wanted to get the process started, but that NCM's ten-day delay would afford
appellants ample time to raise any concerns. Brooks thought that he made it obvious to appellants
that he would be submitting the request to NCM; among other things, the front page of the request
was a fax cover sheet addressed to NCM and his handwritten note advised appellants, "If you have
any questions please call me at your Earliest Convenience." Brooks introduced evidence of the
construction contract and loan agreement terms, which did not require appellants' prior approval for
the second draw, but required them to object within five days if the work for which the draw was
requested did not meet the plans and specifications.

 Appellants explained that they did not respond to the second draw request because
they had understood that, as with the first draw, Brooks could not obtain the funds unless and until
they approved it. (9)

 NCM received the second draw request and sent an inspector to review Brooks' work. 
The NCM inspector determined that Brooks was entitled to payment for only two of the construction
stages listed in the second draw: wall framing (10%), and roof framing and sheathing (4%)), for a
total of 14% of the construction contract amount. However, NCM then made an internal math error:
it added this 14% to the 14% that it had paid Brooks in the first draw, for a total of 28% of the
construction contract amount. Because Brooks had requested a lesser amount of 24.5%, and not
hearing any objection from appellants, NCM funded the entire amount Brooks had requested. It
wired $98,201.63 to Brooks's bank account--including what NCM later claimed was a $42,086.41
overpayment--on December 23, the same day that Brooks paid the Yetter settlement. It is
undisputed that Brooks never repaid this alleged overpayment, although NCM later credited the
amount back to appellants' loan balance.

 Appellants later emphasized that the amount of NCM's alleged overpayment,
$42,086.41, is a few hundred dollars less than the $42,500 Yetter settlement he paid on the same day,
and insinuated that Brooks intentionally inflated the second draw request to fund the settlement. 
Brooks dismissed any connection between the draw and the settlement, testifying that he funded the
Yetter settlement with money paid to him by his father-in-law, who had not demanded to be repaid. 

 Appellants also later accused Brooks of making misrepresentations in the supporting
documentation accompanying the second draw request. Along with the document listing completed
construction stages and corresponding authorized draw percentages, Brooks had submitted a
document titled "Draw Request to Owner and Lender" on which he itemized figures for various
materials and subcontractor labor related to the construction stages he listed on the other document. 
The total of these figures matched the $98,201.63 requested draw amount. Brooks checked a box
on the document indicating that the items "have been paid for." Brooks later admitted that the dollar
amounts he assigned to each item exceeded the amounts he had actually paid for materials and to his
subcontractors, and several of his subcontractors corroborated this account. 

 Brooks denied that he had inflated the amount of the second draw, maintaining that
he had determined the amount in a manner consistent with the draw schedule, his first draw request,
and industry standards. Brooks testified, as did many of his subcontractors, that the work Brooks
claimed in the second draw request had actually been completed, and Brooks suggested that he had
completed even more work than he had claimed in the request. As for the itemizations in the "Draw
Request to Owner and Lender," Brooks explained that, consistent with industry practice, he had
simply allocated the total authorized draw amount to the various categories of work that had been
performed, and that any discrepancies reflected allowable profit. Brooks points out that a NCM
representative testified that the bank was not concerned with the precise amount that each
subcontractor was paid, only that each subcontractor got paid so there were no liens. 

 On December 30, appellants claimed that they learned for the first time that NCM had
funded the second draw request. Contending that this was the "final straw," appellants sent a letter
to Brooks directing him "TO STOP ALL WORK" on the new home construction and indicating
that they would be consulting with their attorney. A January 3, 2003, letter from appellants' counsel
at the time notified Brooks that the construction contract was terminated effective immediately.


Proceedings below

 On March 4, 2003, Brooks filed suit against appellants, and appellants
counterclaimed. Trial began on March 2, 2004. During trial, appellants sought and were granted
leave, over objection, to file an amended pleading adding, for the first time, a breach of fiduciary
duty claim against Brooks relating to his conduct in obtaining the second draw. The district court
submitted the following claims and defenses to the jury:



 Brooks's claim against appellants for breach of the new home construction
contract; and, conditioned on an affirmative finding, appellants' affirmative
defenses of anticipatory breach and payment.

 Brooks's claim against appellants on an open account related to Brooks's work
on appellants' existing home; and, conditioned on an affirmative finding,
appellants' affirmative defenses of judicial estoppel and payment.

 Brooks's quantum meruit theory against appellants related to his work on
appellants' existing home.

 Appellants' claim against Brooks for breach of the new home construction
contract; and, conditioned on an affirmative finding, Brooks's affirmative
defenses of waiver, equitable estoppel, and anticipatory breach.

 Appellants' unjust enrichment claim against Brooks related to the second draw.




 Appellants' breach of fiduciary duty claim against Brooks related to the second
draw.

 Appellants' DTPA breach of warranty claim related to Brooks's new home
construction; and, conditioned on an affirmative finding, whether such conduct
was committed knowingly.

 Appellants' fraud claim against Brooks related to Brooks's new home
construction.

 Conditioned on affirmative findings regarding appellants' breach of contract and
fraud claims, Brooks' affirmative defense of ratification.




The jury found in the affirmative on each of Brooks's liability claims and against appellants on their
affirmative defenses. It also found against appellants on each of their claims. The jury awarded
Brooks $42,000 on his claims for appellants' breach of the construction contract, $4,400 on Brooks's
claim on an open account for work performed on appellants' existing home, and $2,100 on Brooks's
quantum meruit claim regarding that work.

 On May 7, 2004, appellants filed a motion for new trial based on claims of newly-discovered evidence. Appellants claimed that after the verdict, they discovered for the first time that
their new home's foundation had been poured on loose fill. They argued that if the jury had known
that Brooks had poured the foundation on loose fill, it would likely have found in their favor on their
affirmative defense of anticipatory breach. The district court denied appellants' new trial motion.

 The district court rendered judgment on the verdict and awarded $50,000 in trial-level
attorney's fees, $10,000 in conditional fees for an unsuccessful appeal to the court of appeals, and
another $5,000 for an appeal to the Texas Supreme Court. This appeal followed.


DISCUSSION


 Appellants bring five issues primarily challenging portions of the judgment relating
to the new home construction at 9221 Simmons Road; they do not contest the part of the judgment
awarding damages to Brooks on his claims relating to his work on appellant's home at 7500 Step
Down Cove. In their first two issues, appellants challenge the underpinnings of Brooks's award of
$42,000 in actual damages and attorney's fees on his breach-of-contract claim. First, appellants
challenge the legal and factual sufficiency of the evidence supporting the jury's finding that Brooks
complied with his fiduciary duty to them. Based on that contention, appellants argue in their second
issue that Brooks's breach of fiduciary duty constitutes a material breach of the contract that would
excuse their subsequent termination of the contract as a matter of law. (10) In response to these issues,
Brooks urges in a cross-point that the district court abused its discretion in granting appellants leave
to amend their pleadings at trial to add their breach of fiduciary duty theory and that the issue should
not have been submitted to the jury.

 In their third issue, appellants challenge the legal and factual sufficiency of the jury's
$42,000 damages award on Brooks's claim for breach of the construction contract. In their fourth
issue, they contend that the district court abused its discretion in awarding $15,000 in contingent
appellate attorney's fees. In their fifth issue, appellants contend that the district court abused its
discretion in denying its motion for new trial based upon newly discovered evidence.


The breach of fiduciary duty finding

 In their first issue on appeal, appellants assert that there is legally and factually
insufficient evidence to support the jury's finding that Brooks complied with his fiduciary duty to
appellants. We disagree.

 We will sustain a legal sufficiency point if the record reveals: (a) the complete
absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no
more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, "No
Evidence" & "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). The
ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. See id. at 827.

 When the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal
effect, is no evidence. See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (citing
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). But more than a scintilla of evidence
exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ
in their conclusions. Id. (citing Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997)). We review the evidence in the light favorable to the verdict, crediting favorable evidence
if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. See
City of Keller, 168 S.W.3d at 807.

 We emphasize that jurors are the sole judges of the credibility of the witnesses and
the weight to give their testimony. Id. at 819. When there is conflicting evidence, it is the province
of the jury to resolve such conflicts. Id. at 820. If conflicting inferences can be drawn from the
evidence, we assume jurors made all inferences in favor of their verdict if reasonable minds could,
and disregard all other inferences. Id. at 821. But if the evidence allows only one inference, we may
not disregard it. See id. So long as the evidence falls within a zone of reasonable disagreement, we
may not substitute our judgment for that of the trier-of-fact. See id. at 822.

 When reviewing a challenge to the factual sufficiency of the evidence, we must
consider, weigh, and examine all of the evidence in the record. Plas-Tex, Inc. v. U.S. Steel Corp.,
772 S.W.2d 442, 445 (Tex. 1989). If a party is attacking the factual sufficiency of an adverse finding
on an issue to which the other party had the burden of proof, the attacking party must demonstrate
that there is insufficient evidence to support the adverse finding. Westech Eng'g, Inc. v. Clearwater
Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App.--Austin 1992, no writ). We should set aside
the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and
manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 The starting point for our analysis of appellants' evidentiary sufficiency challenges
is the charge as submitted to the jury. Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (legal
sufficiency); Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 762 (Tex. 2003) (factual
sufficiency); Ancira Enters., Inc. v. Fischer, 178 S.W.3d 82, 93 (Tex. App.--Austin 2005, no pet.).
The focus of our inquiry, then, is Question 9, in which the jury was asked, "Did Jon Brooks comply
with his fiduciary duty to Dahlia Gutierrez and George Dix?" The jury was instructed that to prove
he complied with his duty Brooks had to show, by a preponderance of the evidence, that:


a. The transaction in question was fair and equitable to Dahlia Gutierrez and
George Dix;


b. Jon Brooks made reasonable use of the confidence that Dahlia Gutierrez and
George Dix placed in him;


c. Jon Brooks acted in the utmost good faith and exercised the most scrupulous
honesty toward Dahlia Gutierrez and George Dix;


d. Jon Brooks placed the interests of Dahlia Gutierrez and George Dix before his
own, did not use the advantage of his position to gain any benefit for himself at
the expense of Dahlia Gutierrez and George Dix, and did not place himself in
any position where his self-interest might conflict with his obligations [as] a
fiduciary; and


e. Jon Brooks fully and fairly disclosed all important information to Dahlia
Gutierrez and George Dix concerning the transaction. (11)



The jury answered this question in the affirmative. 

 The "transaction" referenced in this jury instruction was the second draw, in which
Brooks obtained $98,201.63 from NCM. Appellants contend that there is legally or factually
insufficient evidence that, in connection with the second draw, Brooks "exercised the most
scrupulous honesty" toward appellants, placed appellants' interests before his own, and "fully and
fairly disclosed all important information" to appellants. But appellants' contentions are predicated
largely upon disputed factual assertions, including appellants' claims that: (1) on December 10, Dix
told Brooks to wait on sending a second draw request until appellants could confer with their
attorney on how to proceed in light of the Yetter settlement, and (2) Brooks inflated the amount of
the second draw request. We have previously reviewed the evidence relevant to these assertions. 
It includes Brooks's testimony denying that appellants ever told him not to submit his second draw
request and explaining how he calculated the second draw amount and why it was correct. We
conclude that Brooks met his burden of adducing legally and factually sufficient evidence to enable
a reasonable jury to reject appellants' view of these pivotal facts. 

 Appellants also contend that, in essence, Brooks did not do enough to alert them that
he was submitting the second draw request to NCM at or around the same time he left a copy at their
home. They emphasize that (1) Brooks did not specifically inform them that he was faxing the draw
request to NCM, (2) Brooks had not proceeded with the first draw request until after they had
approved it, and (3) Brooks had sent appellants a letter outlining the procedure he had used when
submitting the first draw request and did not affirmatively state that he would follow a different
procedure in future draws. Appellants also urge that Brooks's handwritten note on the cover
sheet--specifically, the portion where he wanted them to "have it for Monday"--implied that he was
awaiting their approval before proceeding. Viewing the record as a whole, see City of Keller, 168
S.W.3d at 807; Plas-Tex, 772 S.W.2d at 445, we conclude that the evidence was legally and factually
sufficient to permit a reasonable jury to conclude that Brooks had fully and fairly disclosed that he
was submitting the second draw request, placed appellants' interests ahead of his own, and acted
with scrupulous honesty in that regard. Among other evidence, the jury could have considered the
language of the construction contract and loan agreement, which required prior approval only of the
first draw and otherwise gave them five days to object; that the first page of appellants' copy was
a fax cover sheet addressed to NCM; that Brooks's handwritten note invited appellants' comments
and questions; and that Brooks had hand-delivered the copy to appellants' home and attempted to
present it to them in person. 

 Concluding that there is legally and factually sufficient evidence to support the jury's
finding that Brooks complied with his fiduciary duty to appellants in regard to the second draw, we
overrule appellants' first issue on appeal. In light of this disposition, we need not reach either
appellants' second issue or Brooks's cross-point. 


Damages

 In their third issue, appellants challenge the legal and factual sufficiency of the jury's
award of $42,000 on Brooks's contract claim. Again, we start with the charge actually submitted
to the jury. Golden Eagle,116 S.W.3d at 762; Osterberg, 12 S.W.3d at 55. In pertinent part, the jury
was instructed that when calculating the amount of damages:


[Y]ou should consider the following elements of damages, if any, and none other:
The amount [appellants] agreed to pay Jon Brooks under the Residential
Construction Contract, less the expenses that Jon Brooks saved by not completing the
construction of the residence, and less the amounts that were previously paid to Jon
Brooks under the contract. 



As previously discussed, it is undisputed that appellants agreed in the construction contract to pay
Brooks $525,823, $400,823 of which represented the total construction cost, and that Brooks was
paid a total of $150,559.73 in his two draws under the contract. Subtracting Brooks's payments from
the contract amount yields a net amount of $375,263.27. Appellants complain that there was no
evidence of the remaining variable that the jury was instructed to subtract from that sum, "the
expenses that Jon Brooks saved by not completing the construction of the residence," and thus
legally or factually insufficient evidence to support the $42,000 figure the jury ultimately found. 
Appellants further insinuate that the jury likely chose the $42,000 figure for purely symbolic reasons
related to the second draw dispute. We conclude that the jury's damage award is supported by
legally and factually sufficient evidence.

 As appellants acknowledge, Brooks testified that he had calculated his contract
damages under the formula in the jury instruction and arrived at a figure of $67,000 "and some
change." Appellants' characterize Brooks's damage calculation as merely a "lump sum,"and equate
the jury's award of a lesser figure to the situation in First State Bank v. Keilman, 851 S.W.2d 914
(Tex. App.-Austin 1993, writ denied). In Keilman, the jury heard evidence that damages were either
$7,161.44 or zero, yet awarded $360. Id. at 929. We held that no evidence supported this award,
as it was "inexplicable in light of the evidence" and "it appear[ed] that the jury pulled a number out
of a hat." Id. at 931.

 Appellants' characterization of the record overlooks such evidence as Brooks's initial
cost estimates of all of the labor and material that would go into the new home (12) and evidence
regarding the work that had been completed at the time of termination. This evidence supplied a
basis for the jury rationally to ascertain the expenses Brooks would save from not completing
construction, (13) and, thus, the net amount of contract damages to which he was entitled.

 Juries have broad discretion in assessing damages where the law provides no precise
legal measure; a jury's findings will not be disregarded merely because its reasoning in arriving at
its figures may be unclear so long as a rational basis for its calculation exists. McMillin v. State
Farm Lloyds, 180 S.W.3d 183, 201 (Tex. App.--Austin 2005, no pet.); Swank v. Sverdlin, 121
S.W.3d 785, 799 (Tex. App.--Houston [1st Dist.] 2003, pet. denied); Keilman, 851 S.W.2d at 930. 
In McMillin, we rejected a similar legal and factual sufficiency challenge to a jury's $1000 damage
award to the McMillins on their claims that State Farm had breached their homeowner's insurance
policy. McMillin, 180 S.W.3d at 203. The only explicit reference to a $1000 amount in the record
was a speculative suggestion by Mr. McMillin that he might have paid his $1000 deductible twice. 
Id. at 202. Nonetheless, we found legally and factually sufficient evidence to support even the $1000
award where the evidence supported a range of awards between $0 (State Farm's contention) up to
$242,382.95 (McMillins' contention). Id. at 203. We reasoned:


This is not like Keilman in which the jury had to choose between competing theories
on how interest should be calculated. . . . Rather than a binary choice or a series of
binary choices, this evidence presented the jury with a range of possible awards. 
That they chose a round figure near the low end of the range does not invalidate the
award. 

Id. We likewise conclude that the evidence here was sufficient to enable reasonable jurors to chose
from a range of possible damage awards that included the $42,000 amount it ultimately awarded. 
We overrule appellants' third issue.


Appellate attorney's fees

 In their fourth issue on appeal, appellants complain that the district court abused its
discretion in awarding a total of $15,000 in contingent appellate attorney's fees to Brooks. In lieu
of presenting evidence on attorney's fees at trial, the parties stipulated the following:


Reasonable and necessary attorney's fees incurred by Brooks through completion of
trial in this case are $50,000.00. . . . 


If, upon final trial, the court finds that attorney's fees are recoverable, then the parties
agree and stipulate that the above amounts may be awarded and that no evidence
shall be required or presented at trial or post-trial regarding the amount of fees
incurred, regardless of whether the fees are reasonable and necessary or regarding
allocation of fees to any cause(s) of action for which fees are awarded or recoverable.



When awarding appellate attorney's fees, the district court relied on section 38.004 of the civil
practice and remedies code, which authorizes trial courts to "take judicial notice of the usual and
customary attorney's fees and the contents of the case file without receiving further evidence" in
either a bench trial or "a jury case in which the amount of attorney's fees is submitted to the court
by agreement." Tex. Civ. Prac. & Rem. Code Ann. § 38.004 (West 1997). Under section 38.004,
a trial court has discretion to award attorney's fees in the event of an appeal even though no evidence
is offered on the matter. See Gill Sav. Ass'n v. Chair King, Inc., 797 S.W.2d 31, 32 (Tex. 1990);
Superior Ironworks, Inc. v. Roll Form Prods., Inc., 789 S.W.2d 430, 431 (Tex. App.--Houston [1st
Dist.] 1990, no writ). Whether to award any party attorney's fees rests in the sound discretion of the
trial court, and its judgment will not be reversed absent a clear showing that it abused its discretion. 
McCord v. Watts, 777 S.W.2d 809, 813 (Tex. App.--Austin 1989, no writ). 

 The parties dispute whether their stipulation was an agreement to submit the issue of
appellate attorney's fees to the district court so as to invoke section 38.004. Appellants construe the
stipulation to be limited only to trial-level attorney's fees, leaving appellate attorney's fees outside
of section 38.004 and governed by the usual requirements of proof. Because Brooks did not put on
evidence of attorney's fees nor obtain a jury finding on that issue, appellants contend that the district
court abused its discretion in awarding him those fees.

 Brooks responds that the stipulation removed the entire issue of attorney's fees--both
trial- and appellate-level--from the jury and submitted them to the district court. He emphasizes
language that the stipulated (trial-level) amounts may be awarded, "If, upon final trial, the court finds
that attorney's fees are recoverable." In other words, Brooks maintains that the stipulation's
reference to trial-level attorney's fees did not define the stipulation's scope, but merely represented
the parties' agreement concerning one of the attorney's fees elements they had agreed to submit to
the district court. Appellate attorney's fees, Brooks contends, could thus be determined by the
district court under section 38.004. 

 A stipulation is "an agreement, admission, or other concession made in a judicial
proceeding by the parties or their attorneys respecting some matter incident thereto." Shepherd v.
Ledford, 962 S.W.2d 28, 33 (Tex. 1998). It constitutes a binding contract between the parties, may
be used to limit or exclude the issues to be tried, and even obviates the need for proof on the litigable
issue. ExxonMobil Corp. v. Valence Operating Co., 174 S.W.3d 303, 311 (Tex. App.--Houston [1st
Dist.] 2005, pet. filed). As with all contracts, when construing a stipulation, the court must
determine the intent of the parties from the language used in the entire agreement, examining the
surrounding circumstances, including the state of the pleadings, the allegations made therein, and
the attitude of the parties with respect to the issue. See id.; Discovery Operating, Inc. v. Baskin, 855
S.W.2d 884, 886-87 (Tex. App.--El Paso 1993, orig. proceeding). A stipulation should not be given
greater effect than intended and should not be construed as an admission of a fact intended to be
controverted. Austin v. Austin, 603 S.W.2d 204, 207 (Tex. 1980).

 We agree with Brooks that the district court had authority under section 38.004 to
take judicial notice of and award appellate attorney's fees. Construing the stipulation as a whole,
we conclude that it had the effect of removing the entire issue of attorney's fees from the jury trial
and submitting it to the district court. The title of the stipulation is "Stipulation on Attorney's
Fees"--not merely trial-level attorney's fees--and it contemplates broadly that "no evidence shall
be required or presented at trial or post-trial regarding the amount of fees incurred, regardless of
whether the fees are reasonable and necessary or regarding allocation of fees to any cause(s) of action
for which fees are awarded or recoverable." Having placed the attorney's fees issue before the
district court, the fact that the parties agreed to a fixed amount only of trial-level fees would not
alone preclude the district court from additionally awarding appellate fees under section 38.004. The
parties merely left unaddressed the amount of appellate attorney's fees; they did not state that no
such fees would be awarded. Our conclusion is further supported by the legislature's instruction that
chapter 38 "shall be liberally construed to promote its underlying purposes." Tex. Civ. Prac. & Rem.
Code Ann. § 38.005 (West 1997). The district court did not abuse its discretion in taking judicial
notice of usual and customary appellate attorney's fees and the contents of the case file, and
awarding appellate attorney's fees on that basis. We overrule appellants' fourth issue.

Newly discovered evidence

 In their fifth issue on appeal, appellants assert that the district court abused its
discretion in denying their motion for new trial on the basis of "newly-discovered evidence" that
Brooks had poured their foundation on loose fill. We will not disturb the district court's decision
to deny a motion for new trial absent an abuse of discretion. Trinity Indus. v. Ashland, Inc., 53
S.W.3d 852, 869 (Tex. App.--Austin 2001, pet. denied). A party moving for a new trial based upon
the existence of newly discovered evidence has the burden of showing: (1) admissible, competent
evidence showing the existence of the newly discovered evidence; (2) the evidence has come to the
party's attention since trial and the party had no notice of its existence before trial; (3) the party used
due diligence to procure the evidence before trial; (4) the evidence is not merely cumulative of that
already presented and does not tend only to impeach the testimony of the adversary; and (5) the
evidence would probably produce a different result if a new trial were granted. Connell Chevrolet
Co. v. Leak, 967 S.W.2d 888, 894 (Tex. App.--Austin 1998, no pet.). We conclude that the district
court did not abuse its discretion in concluding that appellants did not meet this standard.

 Regarding the due diligence element, we have held that "diligence has not been
exercised if the same effort used to procure the testimony subsequent to trial would have had the
same result if exercised prior to trial." Dorbandt v. Jones, 492 S.W.2d 601, 603 (Tex. Civ.
App.--Austin 1973, writ ref'd n.r.e.). The contractor who purportedly first discovered that the
foundation had been poured upon loose fill, foundation repair contractor Raymond Wendland,
testified at the hearing on appellants' new trial motion that appellants first contacted him on April
9 or 10, after finding his name in the phone book. Wendland claimed that the foundation problem
would have been obvious to anyone who had dug a trench to investigate it and that he did not need
to perform tests to ascertain that the house had been built on loose fill. Wendland added that he
would have discovered the problem, if appellants had asked him to investigate, as early as February
2004, October 2003, or August 2003.

 Gutierrez also testified at the hearing, admitting that she had been aware before trial
that the lot had drainage problems impacting the foundation and that she and her husband had raised
numerous complaints about Brooks's work while he was on the project. Additionally, at trial,
appellants testified extensively regarding their concerns with Brooks's work, that they had consulted
several engineers to investigate the foundation before approving Brooks's first draw request, and that
one of the engineers had suggested digging a hole near the foundation to examine it.

 We conclude that the district court did not abuse its discretion in denying appellants'
motion for new trial. We overrule appellants' fifth issue. 


CONCLUSION


 Having overruled each of appellants' issues on appeal, we affirm the judgment of the
district court.



 

 Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: April 7, 2006

1. This work included such things as installing new cabinets above the four-foot line,
replacing toilets and valves, and installing new garage doors. 
2. For example, Brooks observed that Dix later met with George Pulliam, the project
engineer, and that Pulliam reported that he was quite pleased with the work that had been performed
on the new home. 
3. Brooks placed most of the blame on Gutierrez, who described herself at the time as an
"unemployed lawyer." Dix is a law professor. 


 The jury heard evidence of appellants' disputes with two other contractors who later
worked on their new home, including considerable correspondence from Gutierrez complaining of
various details of the contractors' work - and one letter which claimed that Dix had "decided that
all of the delays in construction and the amount of time necessary to accomplish even the smallest
task, such as selecting paint, are in fact solely my fault" (emphasis in original) and that "I am
responsible for all of the construction problems . . . with all three builders." 
4. Shortly after obtaining both signatures, Brooks submitted the signed draw request to NCM. 
However, NCM refused to accept this request because Brooks had used his own form rather than that
required by NCM. Brooks thus reentered the same figures on the NCM form, obtained appellants'
signatures again, and finally resubmitted the request on September 24.
5. Appellants acknowledged that they were having marital problems at this time, and
correspondence from Dix in response to Brooks's payment requests alludes to concerns with
community property issues. Appellants attributed their difficulties to their concern about the
construction projects and their being confined to a small apartment during the weeks and months
while work was underway on their existing home. 
6. In a November 12 letter, Brooks stated that, "It is my understanding that my attorney had
given you some property code statutes that he feels should result in the dismissal of the suit, however
I feel that it is not your responsibility to bear the expense of answering this lawsuit." Brooks further
"apologize[d] for any inconvenience that this had caused you both, and it is my hope that . . . this
will be dismissed as soon as possible." 
7. Brooks explained that he settled the suit rather than "[going] for the . . . overturn of the
judgment" to remove the encumbrance from his ongoing business and customers and "put[] a
finalization to it."
8. These items are part of the roof. 
9. Appellants also argue that a November 22 letter from Brooks implies that he would follow
the same process as the first draw with any subsequent draws. This letter notified appellants that he
had received the first draw on October 1, explained the process by which he had obtained the draw,
and stated that he had paid all invoices and obtained lien waivers from each contractor who had
performed work related to that draw. 
10. For the same reasons, appellants also argue that Brooks's breach of fiduciary duty would
entitle them to damages under their breach of contract theory. They seek either a judgment awarding
them damages or a new trial.
11. On appeal, Brooks does not dispute the existence of a fiduciary duty or challenge the
manner in which the district court submitted appellants' fiduciary duty claim other than to contend
that the district court abused its discretion in permitting appellants to amend their pleadings at trial
to add this claim. 
12. Plaintiff's Exhibit 23. 
13. In fact, notes from the jury during its deliberations suggest that it engaged in this inquiry. 
Among other questions, the jury inquired whether there was a breakdown of the damages claimed
by Brooks and whether the damage award had to be a fixed number or could be a range of numbers.